**UNITED STATES,**

v.

**Senior Airman Andrew P. WITT,**
**United States Air Force.**

**ACM 36785**

U.S. Air Force Court of Criminal Appeals

Sentence adjudged 13 October 2005 by
GCM convened at Bibb County
Courthouse, Georgia.

9 August 2013

734

Military Judge: W. Thomas Cumbie.

Appellate Counsel for the Appellant: Dwight H. Sullivan, Esquire (argued); Major Daniel E. Schoeni (argued); Colonel Nikki A. Hall; Major Shannon A. Bennett; Major Michael A. Burnat; Major Timothy M. Cox; Major Michael S. Kerr; Major Nicholas W. McCue; and Captain Tiaundra D. Sorrell.

Appellate Counsel for the United States: Major Charles G. Warren (argued); Gerald R. Bruce, Esquire (argued); Colonel Don M. Christensen; Colonel Douglas P. Cordova; Lieutenant Colonel Linell A. Letendre; Lieutenant Colonel Jeremy S. Weber; Lieutenant Colonel Nurit Anderson; Lieutenant Colonel Martin J. Hindel; Lieutenant Colonel Matthew S. Ward; Major Deanna Daly; Major Jason M. Kellhofer; Major G. Matt Osborn; Major Donna S. Rueppell; Major Roberto Ramirez; and Major Ryan N. Hoback.

Before, STONE, ORR, HARNEY, MARKSTEINER, and SARAGOSA, Appellate Military Judges

## OPINION OF THE COURT

SARAGOSA, Judge:

The appellant was tried by a general court-martial composed of twelve officers, between April and October 2005. He was found guilty of the premeditated murders of Senior Airman (SrA) AS and his wife JS, as well as the attempted premeditated murder of (then) SrA JK, in violation of Articles 118 and 80, UCMJ, 10 U.S.C. §§ 918, 880, respectively. On 13 October 2005, the members sentenced the appellant to death. The convening authority approved the findings and sentence as adjudged.

On appeal, the appellant has raised 88 issues which relate to the findings of guilty, the sentence, post-trial processing, and other miscellaneous systemic errors. For the reasons set forth below, we affirm the findings and set aside the sentence and return the record of trial to The Judge Advocate General for remand to the convening authority.

### I.

### Background

On the evening of 4 July 2004, SrA AS and his wife, JS, arrived at the on-base home of SrA JK and his wife to celebrate Independence Day. JK's wife went to bed at approximately 0100 hours on 5 July 2004. At some point in the morning hours, JS told her husband and SrA JK that the appellant had made a sexual advance toward her on the evening of 3 July 2004 when the appellant was a guest at her home. This disclosure made her husband angry, so he called and confronted the appellant at 0137 hours. He followed up with two additional completed phone calls to the appellant and nine additional unanswered calls. The last call originating from either SrA AS or SrA JK was at 0212 hours. At 0221, the appellant called SrA AS and they spoke for 33 minutes.

At some point during the phone call exchanges, the appellant changed into his battle dress uniform (BDU). He retrieved a knife from his closet, placed the knife in the trunk of his car, and drove onto Warner Robins Air Force Base, Georgia, arriving at approximately 0315. He would later write in

a statement to the Air Force Office of Special Investigations (AFOSI) that he wore his BDUs because he "wanted to observe them unseen to see what was going on." He also told his roommate that he wore the BDUs so "they wouldn't see [him]." He further told his roommate that SrA AS had threatened to get him into trouble by disclosing his advance toward his wife and an affair he was having. In his written statement, the appellant stated that SrA AS was yelling at him during the phone calls and threatened his career.

When he arrived on base, the appellant parked his car in base housing about 50 yards from SrA JK's residence. The appellant later admitted to the AFOSI, during an interview, that he went to SrA JK's residence and observed them from behind the bushes and the trees. There were additional heated phone calls between the appellant and SrA JK after the appellant arrived on base. There were also phone calls in which the appellant was apologetic or told SrA JK that he and SrA AS "should come over here and kick my ass." SrA JK responded with words to the effect of, "You need your ass kicked."

At approximately 0400 hours, SrA AS, SrA JK, and JS drove from SrA JK's house to SrA AS's house, approximately 0.2 miles away and still in base housing. The appellant watched the three get into a vehicle and drive away. He then traveled to SrA AS's house by foot. The trio were already inside the home when the appellant let himself in and found SrA AS in the kitchen. SrA AS yelled at the appellant to get out of his house. A scuffle ensued between the two men. SrA JK came in and put the appellant in a headlock as he tried to get him off of SrA AS. Once free, SrA AS turned and went farther into the living room. SrA JK told the appellant to leave, and the appellant responded by stabbing him. As SrA JK screamed, "He's got a knife," he turned to run, and the appellant stabbed him again in the back. SrA JK was eventually able to get outside, where the appellant chased him for some distance. SrA JK ultimately reached a neighbor's home and was able to find help.

The appellant went back to the house and found SrA AS on the phone with 911. He later told the AFOSI agent that he returned because "he didn't want to leave any evidence." He found JS had locked herself in the back bedroom, so he kicked the door a couple of times and used his shoulder to break through the door. Upon finding JS behind the door in a fetal position, he proceeded to break her arm and stab her multiple times because "he was scared to leave a witness." He then returned to SrA AS, stabbing him in the ribs and finally the heart.

During the AFOSI's investigation, the appellant assisted the special agents by leading them to the location where he disposed of the knife he used in the crimes, as well as his BDU cap and boots. DNA analysis revealed blood stains from the appellant's BDU blouse, BDU pants, BDU hat, and boots matched the DNA profile of JS. Trace evidence in the form of red fibers were recovered from the knife. Microscopic analysis showed the fibers were consistent with the characteristics and color of the fibers in the shirts worn by SrA AS and SrA JK who were both wearing red shirts on the night of 4 July 2004.

SrA JK was stabbed a total of four times and sustained a laceration to his arm. Three of these stab wounds were identified as potentially life-threatening. He suffered a stab wound to the chest that punctured his left lung and nearly went through his entire chest cavity. He also suffered stab wounds to his back—one to the splenic hilum that cut the splenic artery and a second to the kidney. He underwent emergency surgery and was hospitalized for 15 days. He also underwent four to five follow-up surgeries, spending over 30 cumulative days in the hospital.

SrA AS suffered three stab wounds. The first of these wounds was to the left side of his back. The knife entered the right chest cavity, penetrated his diaphragm and went into his liver. A second wound cut through SrA AS's backbone at the thoracic vertebrae and severed his spinal cord. This wound left him instantly paralyzed from his upper waist down. While these two wounds were medically significant, they were not lethal or life-threatening. The final stab wound was to his chest, piercing the front and back of the left ventricle of his heart. This wound was im-

mediately lethal and delivered after the previously described paralyzing wound.

JS was stabbed a total of five times, four of which were to her back. One of these wounds was to her left chest cavity, through her diaphragm, and into her spleen, causing her left lung to collapse. A second wound entered the side of her body, going into the abdomen and spleen. A third wound was to her lower back, entering into her kidney and liver. The fourth wound was to the right edge of her back, entering her right chest wall and collapsing her right lung. She also suffered an incised wound to the back, cutting into her sixth, seventh, and eighth ribs. Her final stab wound was located beneath her right armpit, piercing the soft tissue of her breast and entering her chest cavity.

The court-martial convicted the appellant of all the charges and specifications, and findings of guilty of the premeditated murders of SrA AS and JS were announced as unanimous. A sentencing hearing was conducted pursuant to Rule for Courts–Martial (R.C.M.) 1004, after which the court-martial, by unanimous vote, sentenced the appellant to a dishonorable discharge, forfeiture of all pay and allowances, and to be put to death.

Additional relevant facts are set out below in connection with specific issues.

## II.

### Findings Issues

We begin our analysis by addressing the various issues the appellant has raised related to the findings portion of the case.

### A. Qualifications of Trial Defense Counsel

■ As a preliminary issue, the appellant argues that his three trial defense counsel were not qualified to represent him because they did not satisfy the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (ABA Guidelines) (rev. ed. February 2003). The appellant asserts that the ABA

Guidelines are binding on military and civilian trial defense counsel in Air Force courts, relying on various policy memoranda to support his argument. In 2005, The Judge Advocate General (TJAG) of the Air Force issued TJAG Policy Memorandum TJS–3, *Air Force Standards for Criminal Justice* (AFSCJ) (15 May 2005). That memorandum states, in part, that the AFSCJ "were adapted from the *American Bar Association Standards for Criminal Justice* [ (ABA Standards) ]." *Id.* at ¶ 2. Because paragraph 4–1.2(c) of the ABA Standards incorporates the ABA Guidelines,[1] the appellant argues that the ABA Guidelines are binding upon Air Force practitioners through the AFSCJ. We disagree.

■ We review questions of regulatory construction de novo. *United States v. Estrada,* 69 M.J. 45, 47 (C.A.A.F.2010) (citing *United States v. McCollum,* 58 M.J. 323, 340 (C.A.A.F.2003); *United States v. Phillips,* 39 C.M.R. 230, 234 (C.M.A.1969)). When interpreting regulations, we will apply normal rules of statutory construction. *Id.* (citing *United States v. Custis,* 65 M.J. 366, 370 (C.A.A.F.2007)). In our view, the ABA Standards, including those that refer to the ABA Guidelines, are only recommended guidelines and not mandatory rules. Here, the ABA Standards state that they are "intended to be used as a guide to professional conduct and performance," and not as criteria for the "judicial evaluation of alleged misconduct of defense counsel to determine the validity of a conviction." *ABA Standards,* ¶ 4–1.1. Moreover, the ABA Standards state only that defense counsel "should comply with the ABA Guidelines." *ABA Standards,* ¶ 4–1.2(c). The AFSCJ also provides a means for resolving any conflict between the AFSCJ and any standard or guideline inconsistent with legal precedent: "[I]n the event of conflict, the [UCMJ, *Manual for Courts–Martial, United States (MCM* ) ], Air Force Instructions (AFI), the Air Force Rules of Professional Conduct [ (AFRPC) ], case law,

---

1. Paragraph 4–1.2(c) of the *American Bar Association Standards for Criminal Justice* (ABA Standards) states, in part, "Since the death penalty differs from other criminal penalties in its finality, defense counsel in a capital case should re-

spond to this difference by making extraordinary efforts on behalf of the accused. Defense counsel should comply with the [American Bar Association] Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases."

and the Air Force Uniform Code of Judicial Conduct (AFUCJC) will control." *See* TJS–3, Attachment 1 (15 October 2002).

We also note that our superior court has declined to mandate compliance with the ABA Guidelines. *United States v. Loving,* 41 M.J. 213, 300 (C.A.A.F.1994). That Court has also noted that limited experience does not raise a presumption of ineffectiveness. *Id.* (citing *United States v. Cronic,* 466 U.S. 648, 665, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)). *See also United States v. Murphy,* 50 M.J. 4, 9–10 (C.A.A.F.1998) (citation omitted). Instead, the "quality of legal representation" is determined under the standards set by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as analyzed below.

## B. Challenge for Cause of Col DH

The appellant argues that the military judge abused his discretion by denying the defense challenge for cause against Col DH. The appellant asserts that the military judge (1) failed to grant the challenge on implied bias and (2) failed to refer to the liberal grant mandate in his ruling. We disagree on both counts.

R.C.M. 912 includes challenges based upon the concepts of both actual and implied bias. *United States v. Moreno,* 63 M.J. 129, 133 (C.A.A.F.2006) (citing *United States v. Napoleon,* 46 M.J. 279, 283 (C.A.A.F.1997); *United States v. Minyard,* 46 M.J. 229, 231 (C.A.A.F.1997)). The issue sub judice concerns implied bias. R.C.M. 912(f)(1)(N) provides that a member shall be excused for cause whenever it appears that the member "[s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality."

The test for implied bias is objective, viewed through the eyes of the public, and focuses on the appearance of fairness in the military justice system. *United States v. Leonard,* 63 M.J. 398, 402 (C.A.A.F.2006) (citations omitted); *Moreno,* 63 M.J. at 134; *United States v. Rome,* 47 M.J. 467, 469 (C.A.A.F.1998); *United States v. Daulton,* 45 M.J. 212, 217 (C.A.A.F.1996). If the public

perceives that an accused received less than a court composed of fair, impartial, and equal members, our superior court has not hesitated to set aside the affected findings and/or sentence. *See Leonard,* 63 M.J. at 403; *Moreno,* 63 M.J. at 135; *United States v. Wiesen,* 56 M.J. 172, 176–77 (C.A.A.F.2001). However, implied bias should be relied upon sparingly. *United States v. Strand,* 59 M.J. 455, 458 (C.A.A.F.2004) (citations omitted).

We review rulings on challenges for implied bias under a standard that is less deferential than abuse of discretion, but more deferential than de novo review. *Moreno,* 63 M.J. at 134; *United States v. Armstrong,* 54 M.J. 51, 54 (C.A.A.F.2000); *Napoleon,* 46 M.J. at 283. Military judges are required to follow the liberal-grant mandate in ruling on challenges for cause made by an accused. *Moreno,* 63 M.J. at 134 (citing *United States v. James,* 61 M.J. 132, 139 (C.A.A.F.2005)); *United States v. Downing,* 56 M.J. 419, 422 (C.A.A.F.2002); *United States v. White,* 36 M.J. 284, 287 (C.M.A.1993). "[I]n the absence of actual bias, where a military judge considers a challenge based upon implied bias, recognizes his duty to liberally grant defense challenges, and places his reasoning on the record, instances in which the military judge's exercise of discretion will be reversed will indeed be rare." *United States v. Clay,* 64 M.J. 274, 277 (C.A.A.F.2007).

The defense challenged Col DH based upon his relationships with the convening authority and the staff judge advocate (SJA), Col JR. During individual voir dire, Col DH stated that his relationship with the convening authority consisted of attending church and Sunday school together and an occasional lunch together after church. Col DH stated that he had never been to the convening authority's house, and that the convening authority had been to his house on two occasions: once for a birthday celebration and the other to offer condolences after Col DH had been injured.

Col DH also stated he knew the SJA, Col JR, and that he and Col JR interacted together at social activities and at the gym: "We basically only see each other in the locker room. We do not work out together. We see each other in the locker room, we

have normal conversation for literally a matter of minutes and that's the extent of our normal relationship." He also stated that he and Col JR had never been to each other's house for dinner, but he had on two occasions sought legal advice from Col JR, but interacted mostly with his subordinate attorneys.

We find that the military judge did not abuse his discretion in denying the challenge for cause against Col DH and that he applied the correct legal standard. Prior to issuing his ruling on all the challenges for cause, both for the Government and the defense, the military judge set forth legal standards governing the bias standards and the liberal grant mandate:

> In making my determination on the challenges for cause, there are two potential bias standards that I'm required to look at. One is actual bias, which involves an allegation that the member's bias will not yield to the military judge's instructions, and that is a subjective determination on my part. The second test is implied bias, which indicates would a reasonable member of the public have substantial doubt as to the legality, fairness, and impartiality of the proceedings if the challenge for cause were not granted, and again, an objective test of the public—through the eyes of the public. The court is also mindful of our appellate court's direction that challenges for cause be granted liberally.

In his ruling denying the challenge for cause against Col DH, the military judge stated the following:

> As to [Co. DH], the defense challenge for cause appears to be based primarily on the implied bias standard based on his relationships with the convening authority and/or [Col JR]. In that regard, the defense challenge for cause is denied. While [Col DH] attends Sunday school and church with the convening authority, he is not a close friend. Further, he has not discussed the case with the convening authority, nor has the convening authority mentioned the case to him. The relationship in this case is much less close than many of the other panel members. The fact that [Col DH] sees [Col JR] in the gym—or [Col DH] sees [Col JR] in the

gym but does not work out with him, nor have they discussed the case. Neither of these relationships arise to the level of actual or implied bias. His answers and the answers of [Col C] in voir dire gave me no indication that they would be unable to give fair and balanced consideration to all of the evidence presented by both sides and clearly indicated that they could follow my instructions.

Viewing the ruling through the eyes of the public and focusing on the appearance of fairness in the military justice system, we also find that the military judge did not err. He considered the challenge based upon implied bias, recognized his duty to liberally grant defense challenges, and placed his rationale on the record. Under the "totality of the circumstances particular to [this] case," we find no reason to disturb his ruling. *United States v. Terry*, 64 M.J. 295, 302 (C.A.A.F.2007) (citing *Strand*, 59 M.J. at 456). *See also United States v. Bagstad*, 68 M.J. 460, 463 (C.A.A.F.2010).

### C. Unlawful Command Influence (UCI)

The appellant argues that Col JR exercised UCI throughout the court-martial, based on his role as the SJA for the convening authority. He alleges three ways the actions of the SJA amounted to UCI: (1) the SJA attended most days of the court-martial; (2) the SJA sat in the immediate vicinity of the victims' families and the prosecution's paralegals; and (3) the SJA engaged in communications with the prosecutors during the court-martial proceedings. We disagree.

We review allegations of UCI de novo. *United States v. Wallace*, 39 M.J. 284, 286 (C.M.A.1994) (citation omitted). Article 37(a), UCMJ, 10 U.S.C. § 837(a), states in part, "No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case." The appellant has the initial burden of raising UCI. *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A.1994). Once the issue of command influence is properly placed at issue, "no reviewing court may

properly affirm findings and sentence unless [the court] is persuaded beyond a reasonable doubt that the findings and sentence have not been affected by the command influence." *United States v. Thomas,* 22 M.J. 388, 394 (C.M.A.1986). At the appellate level, we evaluate UCI in the context of a completed trial using the following factors: "[T]he defense must (1) show facts which, if true, constitute [UCI]; (2) show that the proceedings were unfair; and (3) show that the [UCI] was the cause of the unfairness." *United States v. Biagase,* 50 M.J. 143, 150 (C.A.A.F.2003) (citing *Stombaugh,* 40 M.J. at 213). *See also United States v. Simpson,* 58 M.J. 368, 374 (C.A.A.F.2003); *United States v. Reynolds,* 40 M.J. 198, 202 (C.M.A.1994).

Both the appellant and the Government submitted affidavits addressing this issue. After reviewing the record, to include these affidavits, we find that the SJA did not exert UCI.

With respect to Col JR's presence at the court-martial, the record merely shows that he attended the trial but is silent on how his presence created actual or apparent UCI. In his affidavit, Col JR states that he "attended most days of the trial." He further states that "Public Affairs asked that I be the spokesperson to the media in attendance to answer their questions and provide sound bites." Other trial participants, however, only recall Col JR attending portions of the trial.[2] For example, the lead prosecutor, then Major (Maj) VS, recalled that Col JR "attended portions of voir dire, opening statement, maybe a day or so of testimony, closing argument, and sentencing argument." This is corroborated by the assistant trial counsel, Captain (Capt) JW, who stated in his affidavit that "[Col JR] did attend portions of the trial, but I do not believe it was on a regular basis." Affidavits from the appellant affirm that Col JR attended the court-martial, but shed no light on how his presence created UCI. The defense paralegal stated in his affidavit that "I recall [Col JR] attending portions of [the appellant's] court-martial." Likewise, another affiant stated that Col JR would "make an appearance" at the

courthouse but would "not always stay the entire day."

With respect to Col JR sitting near the victims' families when he attended the court-martial, the record convinces us that where he sat was a matter of logistics, not a conscious decision to deliberately align himself with the victims or the prosecution. The record indicates that the courtroom gallery held between 175–200 persons. The appellant's family and friends sat on the side of the courtroom nearest the court members and farthest from the courtroom entrance. The victims' families and friends sat on the side of the courtroom nearest the prosecution, as well as the main entrance and exit to the courtroom, and typically sat in the second and third rows. If someone entered the courtroom during a session, as did Col JR, they would "naturally gravitate" towards the seats nearest the entrance and exit to the courtroom, which happened to be closest to the prosecution and the victims' families. We find no actual or apparent UCI stemming from where Col JR sat during the court-martial.

Finally, with respect to Col JR communicating with the prosecution during the court-martial, we also find no actual or apparent UCI. The record demonstrates that Col JR sometimes, but not often, spoke to both the prosecution and trial defense counsel during recesses in the court-martial, and did so outside the presence of the members. Col JR characterized the conversations as "light in nature, but when official would usually deal with the logistics of the proceeding." He periodically sent updates to the convening authority, but only asked assistant trial counsel for information on one occasion. The lead prosecutor also stated that it is "simply inaccurate" that Col JR sent notes to the prosecution or frequently gave them trial advice. He notes that "[Col JR] gave us remarkably little advice on the course of the trial. He was hands off on the strategy decisions, list of witnesses, selection of exhibits, and the like. He left those decisions completely in the hands of the trial team."

---

2. During the appellate briefing process, the staff judge advocate, trial defense counsel, paralegals, and other trial team members filed affidavits or declarations with the Court.

There must be more than "[command influence] in the air" to justify action by an appellate court. *United States v. Allen*, 33 M.J. 209, 212 (C.M.A.1991) (alteration in original). The appellant has failed to show facts which, if true, constituted UCI by Col JR. The facts instead only show that he attended the trial, sat near the victims' families, and sometimes interacted with counsel for both sides. Having reviewed the appellant's claim, we also conclude that a fact-finding hearing is not necessary. *United States v. Ginn*, 47 M.J. 236 (C.A.A.F.1997).

## D. Findings Argument

█ The appellant asserts the trial counsel committed plain error during his closing argument of the findings portion of the court-martial by "seeking vindication for family members of the victims." The appellant highlights several passages from the argument in support of his position. First, trial counsel stated:

As has become apparent, Mr. President, Members of the Court, evil does exist in this world. And it didn't take your week here, when we were putting on our case, to learn that very fact. All you have to do is read a newspaper, watch a movie, or watch the news. The hard part for people to recognize is that evil can walk through anyone's door at anytime, for the most senseless of reasons. That's the part that people would struggle with, that's the part that those families struggle with everyday.

At times, this argument may sound like it's going to go long and I apologize for that, but I think they deserve to hear what happened that night, because what you're going to find out is that the government has to prove what you see on that screen, the specifications, beyond a reasonable doubt. But as many of your questions have already shown, you all have questions well beyond the elements.

Trial counsel further argued:

And I'm going to tell you members, some of those things you will never know when you deliberate. You will guess, you will talk about, you will theorize about. And another thing you will do, besides just deal with whether or not these things happened, is you're going to want to try to put what happened in the house, blow by blow, stab by stab and you already know you can't; just from hearing the evidence here, you know you will not be able to, because that man killed two of the witnesses.

He chased one of the witnesses out of the house, who, by all accounts—his doctor, himself, EMT and everybody—should have been dead. Evil exists, and for those families evil exists right here, he sits right here.

At a later point in the argument, trial counsel argued:

The defense will suggest to you that adrenaline, adrenaline can cause this. And you heard from [Dr. BM] in the Stipulation of Testimony, we all have it. Members, I would suggest that getting up to give a closing argument in a case with all of the family members here watching can cause a rush of adrenaline. My memory feels fine.

In his closing remarks, he stated:

When you go back and deliberate and you look at the evidence and the premeditation, it is so very obvious. Talk about the crime, go through the order of the crime, understand the order as best you can with the knowledge that you will never have all of your answers. We have struggled to give you as many as we can and the families as many as we can, but at the end of this go back and deliberate on the elements of premeditation and use your common sense and your knowledge of human nature and your understanding of the facts of this case. And take a reasonable doubt instruction that you've now heard and you apply this one that's so obvious and so clear, while sad, and while tragic, and while difficult to comprehend a man like that in the Air Force. You know what he did. You know his purpose. You know his plan. You know his method. Now convict him of premeditated murder and attempted premeditated murder.

Finally, in rebuttal argument trial counsel's references to the victim's family members included:

[T]hroughout this process we've tried to give you the facts. That does not just

mean the facts that prove our case beyond a reasonable doubt. We gave you those facts because you need those for us, the government, to satisfy our burden. We gave you others because you all have the same questions the families grapple with every day, every night.

. . . .

The prosecution agrees that justice is what we require. Premeditated murder is, by its nature, the hardest thing to understand. But do not cheapen it by finding passion where there's none, by finding passion where you see planning, by finding passion where you see motive, by finding passion where you see opportunity, ruins what we have set up to protect our citizens. We do demand justice. Those families have waited 15 months for their day for their kids, because Andy and Jamie aren't here to tell you they need justice. Your common sense tells you what happened to them.

■■■■ The standard of review for determining the propriety of counsel's argument is whether the statement is erroneous and materially prejudices substantial rights of the accused. Article 59(a), UCMJ, 10 U.S.C. § 859(a); *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F.2000). Failure to make a timely objection to matters raised in argument constitutes waiver in the absence of plain error. *United States v. Ramos*, 42 M.J. 392, 397 (C.M.A.1995). "To establish plain error, an appellant must satisfy a four-pronged test. There must (1) be error (2) that is plain (3) that affects substantial rights of an accused." *United States v. Roberson*, 46 M.J. 826, 828 (A.F.Ct.Crim.App.1997) (citing *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)), *aff'd*, 48 M.J. 411 (C.A.A.F.1997). "Once these first three criteria are met, an appellate court may exercise its discretion to notice a forfeited error only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citations omitted). In the case at hand, trial defense counsel did not object to the passages of trial counsel's arguments laid out above. As such, we embark upon the plain error analysis by first asking if these remarks were error at all.

■■■ "Argument must be limited to evidence of the record and to the fair inferences that can be drawn from that evidence." *United States v. Edmonds*, 36 M.J. 791 (A.F.C.M.R.1993) (citing *United States v. Nelson*, 1 M.J. 235 (C.M.A.1975)). It is appropriate for trial counsel—who is charged with being a zealous advocate for the Government—to argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence. *Nelson*, 1 M.J. at 239. However, arguments designed by trial counsel to inflame the passions or prejudices of the court members are clearly improper. *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A.1983).

■■■ With respect to arguments pertaining to a victim or victim's family, military courts have long held that "Golden Rule" arguments asking the court members to place themselves in the position of a near relative of the victim have been held to be improper. *United States v. Shamberger*, 1 M.J. 377 (C.M.A.1976) (trial counsel asked members to place themselves in the position of rape victim's husband, who was restrained and watched as his wife was repeatedly raped); *United States v. Wood*, 40 C.M.R. 3 (C.M.A.1969) (trial counsel asked members to sentence accused from the perspective that their own sons had been the victims of indecent liberties by the accused); *see also United States v. Teslim*, 869 F.2d 316, 328 (7th Cir.1989) ("A 'Golden Rule' appeal in which the jury is asked to put itself in the plaintiff's position 'is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" (citations omitted)).

Nothing about the arguments posed by trial counsel in this case asked the members to place themselves in the position of a near relative of the victims. Instead, the arguments made reference to the presence of the victims' family members throughout the trial and their lingering questions about what happened the night of the murders. The appellant argues these passages in trial counsel's argument were presented with the singular purpose of highlighting "the families and their pain." We disagree.

As a threshold matter, the argument by a trial counsel must be viewed within the context of the entire court-martial. The focus of our inquiry should not be on words in isolation, but on the argument as "viewed in context." *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). *See also Dunlop v. United States,* 165 U.S. 486, 498, 17 S.Ct. 375, 41 L.Ed. 799 (1897) ("If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation."). In this regard, we are not swayed by the handful of passing comments in a rather lengthy argument. We note:

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal appeal into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*Johnson v. United States,* 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).

An overall review of the record of trial, including consideration of the gruesome nature of the offenses themselves, and the entire findings argument, leaves no basis for us to conclude that the trial counsel's argument was calculated to inflame the members' passions or possible prejudices. We find no error.

### E. Admission of Crime Scene and Autopsy Photographs

The appellant further alleges the military judge committed error by admitting crime scene and autopsy photographs over defense objection. We review a military judge's ruling on the admissibility of evidence for abuse of discretion. *United States v. Holt,* 58 M.J. 227, 230–231 (C.A.A.F.2003). A decision to admit or exclude evidence based upon the balancing test set forth in Mil. R. Evid. 403 is within the sound discretion of the military judge. *United States v.*

*Smith,* 52 M.J. 337, 344 (C.A.A.F.2000); *United States v. Phillips,* 52 M.J. 268, 272 (C.A.A.F.2000). "To reverse for 'an abuse of discretion involves far more than a difference in ... opinion.... The challenged action must ... be found to be 'arbitrary, fanciful, clearly unreasonable,' or 'clearly erroneous' in order to be invalidated on appeal.' " *United States v. Travers,* 25 M.J. 61, 62 (C.M.A. 1987) (citations omitted). "An abuse of discretion arises in cases in which the judge was controlled by some error of law or where the order, based upon factual, as distinguished from legal, conclusions, is without evidentiary support." *Id.* (citations omitted).

The exhibits at issue included autopsy photographs for JS and AS, and 29 photographs of the crime scene. Before trial, the defense moved to exclude 18 of these photographs. A full hearing was held on the motion, wherein the military judge heard testimony from Dr. (Lt Col) ER, the medical examiner who conducted the autopsies, and Mr. PK, an expert witness who examined the blood spatter evidence at the crime scene. The witnesses each articulated why every one of the proposed photographs was necessary and helpful to the presentation of their prospective testimony and explanation to the members.

In ruling on the motion to suppress, the record reflects the military judge considered the expert witness testimony, written pleadings, proposed exhibits, as well as a full set of autopsy and crime scene photographs, including those not offered into evidence. The military judge took the matter under advisement, returning to deliver his ruling on the motion nearly two hours after the close of the hearing. He presented an accurate recitation of the applicable Rules, Mil. R. Evid. 401, 402, and 403, and gave detailed findings as to why each of the challenged photographs satisfied evidentiary relevance. He further found that all but four of the photographs had probative value that was not substantially outweighed by prejudicial impact. One of those four photographs depicted a full body shot of JS in the morgue. The three remaining photographs depicted removed organs of AS. Before delivering the final ruling granting the motion to suppress these four photo-

graphs, the military judge further deliberated overnight.

██ "Photographs, although gruesome, are admissible if used to prove time of death, identity of the victim, or exact nature of wounds." *United States v. Gray*, 37 M.J. 730, 739 (A.C.M.R.1992), *aff'd*, 51 M.J. 1 (C.A.A.F.1999) (citations omitted). "It is not a matter of whether the photographs were inflammatory but whether they served a legitimate purpose." *Id.* (citing *United States v. Whitehead*, 30 M.J. 1066, 1070 (A.C.M.R. 1990); *United States v. Bartholomew*, 3 C.M.R. 41, 48 (C.M.A.1952)).

In this case, the testimony of the expert witnesses clearly established the need for the photographs in order to convey the exact nature of the wounds and the crime scene. The probative value of the photographs was not substantially outweighed by any prejudicial effect. The proper law with respect to relevancy and admissibility was applied. We find the military judge did not abuse his discretion in admitting these photographs.

*F. Findings Instructions*

██ The appellant asserts the military judge committed reversible error by denying two of their requested instructions. Reviewing the military judge's decision not to give a requested instruction under an abuse of discretion standard, we note that the test to determine if denial of a requested instruction constitutes reversible error is whether: (1) the charge is correct; (2) it is not substantially covered in the main charge; and (3) it is on such a vital point in the case that the failure to give it deprived defendant of a defense or seriously impaired its effec-

tive presentation. *See United States v. Damatta–Olivera*, 37 M.J. 474, 478 (C.M.A. 1993).

██ The first proposed instruction was tailored from the standard instruction regarding evidence negating mens rea.[3] *See* Department of the Army Pamphlet (D.A. Pam.) 27–9, *Military Judges' Benchbook* [hereinafter "Benchbook"], ¶ 5–17 (1 April 2001). Trial defense counsel argued the proposed instruction was proper because the evidence raised an "issue of whether the accused had an emotional or cognitive impairment that interfered with his ability to form specific intent." Specifically, the defense relied on Dr. BM's stipulation of expected testimony to argue that recent scientific studies have shown "there is an impairment that arises in the ability to plan, to think, to control impulses, when a stressor is presented," and that rises to an "emotional condition of the kind that could impact or impair the ability to premeditate."

The military judge questioned whether the law intended for an instruction to be given on a mental condition when everybody in the world has the ability to or will naturally produce adrenaline. The military judge initially ruled that he would not give the proposed instruction because he felt the mens rea issue had not been raised by the evidence. After further deliberation on the matter overnight, the issue was again argued and the military judge ruled as follows:

> Okay. I have carefully considered the defense's request and did so at length last evening after we first talked about it and I do not believe that the mens rea instruc-

---

**3.** The proposed language of the appellant's mens rea instruction was as follows:

The evidence in this case has raised an issue whether the accused had an emotional and/or cognitive impairment and the required state of mind with respect to the offenses of premeditated murder and attempted premeditated murder. In determining this issue, you must consider all the relevant facts and circumstances. One of the elements of [these] offenses is the requirement of premeditation. You are advised that an accused, because of some underlying impairment, may be mentally incapable of entertaining the premeditated design to kill. You should, therefore, consider in

connection with all relevant facts and circumstances, evidence tending to show that the accused may have been suffering from an emotional and/or cognitive impairment of such consequence and degree as to deprive him of the ability to entertain the premeditated design to kill. The burden of proof is upon the government to establish the guilt of the accused by legal and competent evidence beyond a reasonable doubt. Unless in light of all the evidence you are satisfied beyond a reasonable doubt that the accused, at the time of the alleged offenses was mentally capable of entertaining the premeditated design to kill, you must find the accused not guilty of those offenses.

tion has been reasonably raised by the evidence. Obviously, if [Dr. BM] had testified and testified in accordance with his testimony during an Article 39(a) Session, my decision would have been different, but the evidence before the members shows nothing more than one, that people's ability to remember specific facts are impaired as a result of a stressful situation and the adrenaline that arises from that stressful situation, and there is evidence before the Court that adrenaline does cause stress. The problem here is that there's no fit, there is no testimony to indicate that adrenaline or memory would affect the accused more or less than it would affect the average person. And based on the facts of this case, as they currently exist, it would seem that [trial defense counsel's] request would require a mens rea instruction in every case where someone acted in a violent way as a result of a stressful situation, whether it was caused by them or caused by someone else. So I will not give the mens rea instruction.

Within the given instructions regarding heat of passion and the ability to premeditate, the military judge instructed the members several times, "An accused cannot be found guilty of premeditated murder if, at the time of the killing, his mind was so confused by anger, rage, sudden resentment or fear that he could not or did not premeditate." In applying the test set forth in *Damatta–Olivera* we do not find that the military judge abused his discretion. After careful review of the evidence presented and the proposed instruction, we find the evidence raised to support the charge was minimal and lacked sufficient nexus to the appellant. The evidence of adrenaline was properly before the members for consideration, and the instructions covered the confusion of the mind that may negate the ability to premeditate. As such, we find this issue without merit.

 The second defense requested instruction also addressed premeditation.[4]

However, instead of giving the additional instruction requested, the military judge properly instructed the members on premeditation from the standard Benchbook instructions. The definition and requirements for premeditation were substantially covered in the main instruction given to the members in this case. As such, the members were properly instructed and the appellant has failed to meet the second prong of the *Damatta–Olivera* test. We find the military judge did not abuse his discretion in giving only the standard Benchbook instruction on premeditation.

### G. Impeachment of Staff Sergeant (SSgt.) PG

The appellant alleges the military judge erred in not allowing the presentation of extrinsic evidence of a prior inconsistent statement of SSgt. PG. Specifically, the defense wanted to call a witness who had interviewed SSgt. PG prior to trial to testify about SSgt. PG's prior statements regarding whether the door to SrA AS's home was open or closed when he arrived to investigate.

 This Court reviews a military judge's ruling on the admissibility of evidence for abuse of discretion. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F.2010). A trial judge will typically have a great deal of discretion to determine whether trial testimony is inconsistent with a prior statement. *United States v. Harrow*, 65 M.J. 190, 199 (C.A.A.F.2007) (citations omitted).

Here, SSgt. PG was called as a government witness. When first questioned on direct examination about the front door to SrA AS's home, SSgt. PG testified:

Q. When you got there, did you ascertain whether the front door was locked or not?

A. I didn't.

Q. Did somebody?

A. I don't know.

Q. What door—well, did you enter the [S]'s residence?

A. We did.

---

4. "Premeditation requires that one with a cool mind did, in fact, reflect on the intent to kill before committing the lethal act. Intent to kill alone is insufficient to reach a finding of guilty

for premeditated murder. To reach such a finding of guilty, the lethal act must have been committed after reflection on the consequences by a cool mind."

Q. What door did you go through?

A. The side door under the carport.

Q. And, what room does that lead you into?

A. The kitchen.

Q. And, what is your—who was the lead cop?

A. Sergeant [A] was in the lead.

Q. All right. What was your understanding as to why you went through that door and not another door to the house?

A. The door was already open.

Q. So, you did not go through the front door?

A. I did not go through the front door.

Q. All right. I'm showing you Prosecution Exhibit 22, picture 066. What is that a picture of, Sergeant [PG]?

A. It appears to be the front door of the residence.

Q. All right. That is not—that door was not in that configuration. In other words, it was not open when you arrived at the house?

A. No, it wasn't.

On cross-examination, trial defense counsel further questioned SSgt. PG about his observations as follows:

Q. I want to take you to when you first went to the [S] house, excuse me. When you got there, were you the person at the front door?

A. I was.

Q. You actually knocked on the front door?

A. I did.

Q. But you didn't try to open the front door, is that correct?

A. I did not.

Q. Okay. The other three Security Forces members you were with, that was Sergeant [A], Sergeant [HA], and Sergeant [G]. Is that correct?

A. Correct.

. . . .

Q. Okay. And, you did not try the door?

A. I didn't.

Q. And, you don't know if the door was locked or not?

A. I do not know.

. . . .

Q. Okay. And, the door itself was closed?

A. The door is closed.

Q. Okay. Do you remember speaking with the [AFOSI] agents on the 13th of July, 2004, about what you did that night?

A. Vaguely.

Q. Okay. You spoke with Sergeant, or—Special Agent [N] and Special Agent [R]?

A. I don't recall their names.

Q. Okay, but two Special Agents. Do you do remember that?

A. Yes, sir.

Q. Do you remember them taking notes on that incident?

A. I do.

Q. Okay. During that interview, they took notes that said you said the front door was opened.

ATC1: I'm going to object as to improper 613.

DC: Your Honor, I'll rephrase the question.

MJ: Rephrase the question.

Q: If the agents had written that you had seen that the door was opened, would that have been accurate, inaccurate?

ATC1: Your Honor, that's not a proper question. There is a procedure for doing this. Counsel needs to follow it.

MJ: Overruled. Go ahead.

DC: Thank you.

Q. If the Agents had said that you had said the door was opened in that interview, would they have been correct in writing that down?

A. That would have been correct.

Q. Okay. So, it's possible that the door was open—you told them?

A. I never stated the door was open.

██ The process of impeachment by prior inconsistent statement is a tool to attack the credibility or recollection of a witness. "By showing self-contradiction, the witness can be discredited as a person capable of

error." *United States v. Banker*, 15 M.J. 207, 210 (C.M.A.1983); 3A John H. Wigmore, Evidence § 874 (Chadbourne rev. 1970). Mil. R. Evid. 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to explain or deny the same." If the inconsistency is not admitted, or the witness equivocates, extrinsic evidence may be admitted, but only for impeachment. *Damatta–Olivera*, 37 M.J. at 478 ("[W]hether testimony is inconsistent with a prior statement is not limited to diametrically opposed answers but may be found as well in evasive answers, inability to recall, silence, or changes of position.").

■■■ Here, proper procedure was followed and a proper foundation was laid for the appellant to admit extrinsic evidence of the inconsistent statement for impeachment purposes. The military judge's evidentiary ruling was an abuse of discretion in that the findings of fact upon which he predicated his ruling are not supported by the evidence contained in the record of trial. *See United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citations omitted).

■■■ Having found error, "we now conduct a de novo review to determine whether this error had a substantial influence on the members' verdict in the context of the entire case." *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F.2007) (citing *Kotteakos v. United States*, 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Berry*, 61 M.J. 91, 97 (C.A.A.F.2005)). "We consider four factors: (1) the strength of the government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (citing *Berry*, 61 M.J. at 98).

■■■ In the appellant's court-martial, the Government's case was very strong and included significant admissions by the appellant. The trial defense counsel conceded

that the case was not a question of who committed the crimes, but instead why the crimes were committed. The focus of the defense case throughout was the state of mind of the appellant at the time of the offenses. The inconsistent statement sought to be introduced in this case would have offered extremely little, if any, impact on the defense's theory of the case or presentation of evidence such that it cannot be said to be material to the case. After full consideration of all of the above factors, as well as the fact that the military judge gave trial defense counsel an opportunity to recall SSgt. PG to confront him with the prior statement,[5] we find the error was harmless in this case.

## H. Cumulative Error

■■■ Lastly, the appellant argues that the trial counsel and military judge "injected a myriad of errors" into the record of trial, the cumulative effect of which deprived him of a fair trial. This Court reviews de novo the cumulative effect of all plain errors and properly preserved errors. *United States v. Pope*, 69 M.J. 328, 335 (C.A.A.F.2011). *See also Gray*, 51 M.J. at 61. Under the cumulative error doctrine, "a number of errors, no one perhaps sufficient to merit reversal, in combination necessitate the disapproval of a finding." *Pope*, 69 M.J. at 355 (quoting *United States v. Banks*, 36 M.J. 150, 170–71 (C.M.A.1992)).

■■■ We find the cumulative error doctrine inapplicable to this case. Our superior court has observed, "courts are far less likely to find cumulative error ... when a record contains overwhelming evidence of a defendant's guilt." *United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F.1996) (citation omitted). There was overwhelming evidence of the appellant's guilt in the case at hand. Moreover, having only found harmless error with respect to the impeachment of SSgt. PG, there are no other errors for which we could apply the cumulative error doctrine. Under these circumstances, the appellant was not denied a fair trial.

---

5. A review of the record of trial reveals the defense counsel elected not to pursue this oppor

tunity granted by the military judge.

### III.

### Assistance of Counsel

The appellant has asserted numerous allegations that his trial defense counsel were deficient in their representation of him during the court-martial. He contends he received ineffective assistance of counsel during both the findings and sentencing phases.

#### A. Counsels' Performance in Findings

■ The appellant cites *United States v. Strickland*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to assert that he was denied his constitutional right to effective assistance of counsel during the findings phase of the court-martial. He lists seven different areas where he asserts his counsel were deficient, resulting in his conviction. We review ineffective assistance of counsel claims de novo. *United States v. Anderson*, 55 M.J. 198, 201 (C.A.A.F.2001); *United States v. Wiley*, 47 M.J. 158, 159 (C.A.A.F. 1997).

■ In *Strickland*, the Supreme Court found that the Sixth Amendment[6] entitles criminal defendants to the "effective assistance of counsel"—that is, representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052. Inquiry into an attorney's representation must be "highly deferential" to the attorney's performance and employ "a strong presumption" that counsel's conduct falls within the "wide range of professionally competent assistance." *Id.* at 688–89, 104 S.Ct. 2052. Our superior court has applied this standard to military courts-martial, noting that, "[i]n order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice." *United States v. Green*, 68 M.J. 360, 361 (C.A.A.F.2010) (citing *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052; *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F.2009)).

■ We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690, 104 S.Ct. 2052. In making that determination, we consider the totality of the circumstances, bear in mind "counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work ... [and] recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* "There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [as the Court in *Strickland*] or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F.2001) (quoting *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052).

With these standards in mind, we separately analyze the seven alleged deficiencies during the findings portion of the court-martial.

#### 1. Military Judge's Sentencing Comments During Voir Dire

■ In his first raised issue, the appellant alleges his trial defense counsel were constitutionally ineffective when they failed to object to an instruction given by the military judge during voir dire that commented on sentencing.

At the outset of voir dire of the initial panel of members detailed by the convening authority, the military judge instructed:

> This is a capital murder case. I want to direct your attention specifically to Specifications 1 and 2 of Charge I, on the copy of the charges that you have there. Both are a violation of article 118 of the Uniform Code of Military Justice, commonly referred to as premeditated murder. If the accused is convicted of premeditated murder by a unanimous vote, then the court may, but is not required to, impose the death penalty.

This instruction is taken from the Benchbook. D.A. Pam. 27–9, ¶ 8–3. The instruction is accurate. Therefore, we find that,

---

6. U.S. Const. amend. VI.

given the dual role of the court-martial panel to both decide the findings of the case as well as an appropriate sentence, counsel were not deficient in their performance for failing to object.

### 2. Trial Counsel's Voir Dire Questions

■■■ During voir dire, trial counsel individually questioned seven of the members who were ultimately seated on the appellant's court-martial panel regarding their views as to the comparative loss a family with multiple children would feel as opposed to a family who lost their only child. The appellant argues these questions exceeded the permissible scope of voir dire and that his trial defense counsel were constitutionally ineffective for failing to object.

Given the factual allegations of ineffective assistance of counsel raised by the appellant, on 4 October 2011, this Court ordered trial defense counsel to submit sworn affidavits in response. In the affidavits, trial defense counsel offered no strategic reason for their failure to object, but one counsel noted that they listened intently to the questions posed and would have objected if they thought a question merited objection.

Nonetheless, we need not undertake the related inquiry of ruling on whether or not the questions of counsel were objectionable to resolve the issue in this case. Instead, we find that the failure to object to individually posed voir dire questions of this sort is not error that rises to the level of a constitutional violation because there is no evidence of prejudice arising from the members answering such a question. Thus, the appellant has not met his burden under *Strickland*.

### 3. Peremptory Challenge on Colonel (Col) C

■■■ Trial defense counsel lodged a challenge for cause against potential court-martial member Col C, stating, "[W]e felt that [Col C]'s responses here show a bias and in favor of the death penalty. And his close relationship to both the convening authority and the Staff Judge Advocate creates a further implied bias. And the combination of those two is such that we believe he should be challenged for cause." The military judge denied this challenge. Subsequently, trial

defense counsel exercised their preemptory challenge against Col C.

The appellant argues the use of the preemptory challenge amounts to ineffective assistance of counsel because, "by voluntarily reducing the panel size, the defense counsel made the [G]overnment's burden lighter." He further asserts that trial defense counsel's use of the preemptory challenge "made it measurably easier for the [G]overnment to obtain a death sentence."

In their post-trial affidavits, trial defense counsel articulated that, prior to exercising the preemptory challenge, they were cognizant that more members on the panel is better. However, they balanced that against their concerns that this member "would be both unfavorable to our position and also be a strong advocate to persuade others [sic] members to his position." Ultimately, they decided to exercise the challenge.

Here, trial defense counsel coherently expressed a strategic and tactical basis for deciding to exercise their preemptory challenge. We will not view this decision in hindsight nor second guess the strategic or tactical decision. *Anderson*, 55 M.J. at 202; *United States v. Morgan*, 37 M.J. 407, 410 (C.M.A.1993) (citation omitted). The appellant's trial defense counsel were faced with an almost impossible dilemma. A decision by the appellant's trial defense counsel not to exercise their preemptory challenge to excuse Col C could likely have resulted in a different claim of ineffective assistance of counsel because their failure to challenge Col C would have waived the issue as to whether the military judge abused his discretion in denying his original challenge for cause. R.C.M. 912(f)(4) controls this very situation: "When a challenge for cause has been denied . . . failure by a challenging party to exercise a peremptory challenge against any member [ ] constitute[s] waiver of further consideration of the challenge upon later review."

Finally, we note that we previously addressed this type of issue in *United States v. Simoy*, 46 M.J. 592 (A.F.Ct.Crim.App.1996), *aff'd in part and rev'd in part on other grounds*, 50 M.J. 1 (C.A.A.F.1998), and concluded that, despite the numerical implications of a reduced panel size, any error did

not render counsel's performance so deficient that they were not acting as counsel guaranteed by the Sixth Amendment. *Id.* We reach the same conclusion here.

### 4. Courtroom Security

The appellant's trial was held at the Bibb County Courthouse in Macon, Georgia. The Courthouse provided heightened security not typically found in a courtroom at a base legal office. This included x-ray screening, metal detectors, and armed security present in the courtroom in addition to the security forces personnel escorting the appellant. The appellant argues his counsel should have objected to this additional security and their failure to do so constitutes ineffective assistance of counsel. In response, trial defense counsel asserted:

> [The trial defense team] made sure that SrA Witt was never physically restrained in front of the members and prevailed upon his escorts to minimize their appearance alongside SrA Witt when the members were in the courtroom .... we did not perceive there was anything excessive about the number of uniformed law enforcement personnel present in the courtroom during the trial.

Based on the facts presented by both the appellant and his counsel, we see nothing objectionable about the nature of the courthouse security. Accordingly, a failure to object to the described security does not meet the *Strickland* standard for ineffective assistance of counsel.

The appellant cites to an excerpt from trial defense counsel's argument in which the security is referenced:

> The prosecution made note of the fact that there's guards in the room, and that's why Airman Witt was conducting himself, conducting himself appropriately. But, I ask you: Are the guards not here as much here to protect him from people who are probably angry at him, as they are from stopping him from going anywhere?

The issue as raised is one of ineffective assistance of counsel during the findings portion of the court-martial. However, this commentary regarding the guards was made during counsel's sentencing argument. In addition to finding no deficiency in counsels' decision not to object to the security, we also find no prejudicial impact to the appellant.

### 5. Promises Made During Opening Statement

Next, the appellant asserts his trial defense counsel were constitutionally ineffective when they made promises during the opening statement to produce certain testimony and then failed to present that testimony. Civilian trial defense counsel gave the opening statement in the case and explained:

> The defense is going to put on witnesses who will tell you who Andrew Witt is; where he came from; the Christian home that he was raised in; the divorce of two loving parents; the facts that led him into the United States Air Force; the environment that created the person who committed the acts on the 5th of July. Andrew Witt is in his early twenties. For the most part, the appellant was raised by his mother, [MP], and his stepfather, [Dr. P], who married his mother not long after she divorced her first husband, [TW].
>
> . . . .
>
> [Y]ou will hear evidence regarding Airman Witt's upbringing. You will hear from his parents, his natural mother and stepfather, and you will hear from his natural father [TW] and [EW], who was married to [TW] at one point, but is not married to him today. I also anticipate that you will hear from the sister of [MP], Andrew's aunt, [LS]. With their testimony, you're going to learn about those forces that shaped Andrew Witt and brought him to the point where he was handed over to the Air Force and began an Air Force career.
>
> I anticipate that you're going to hear from two expert witnesses that the defense will call. Dr. BM is a forensic psychologist. He has looked at the facts of this case; he's interviewed multiple individuals and witnesses; and he will testify regarding [SrA] Witt's state of mind on the night of the 4th and into the early morning hours of the 5th of July of 2004.
>
> . . . .
>
> [Dr. BM], the forensic psychologist, I anticipate will testify about Andrew's state of

mind at that point in his life; his state of fear about the fact that these people were threatening to ruin his career; the provocation that flowed from that.

In his post-trial affidavit, co-counsel stated that, at the time the opening statement was delivered, the trial defense team whole-heartedly intended to present the evidence alluded to in their opening statement. They understood the risk of making a promise and not delivering but were confident, based upon their lengthy trial preparation with Dr. BM, that there was "no conceivable reason that [they] would not call [Dr. BM]" as a witness. Additionally, they fully intended "to call [the] appellant's family members to provide the context for Dr. [BM]'s testimony."

On 26 September 2005, the civilian trial defense counsel announced, at a hearing outside the presence of the members pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), that the defense had "elected to name [Dr. BM] as an expert witness based on the opinions he's formed as a result of performing his duties [as a consultant]." The findings testimony of Dr. BM was intended to address issues of the appellant's ability to premeditate. Pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the defense presented preliminary testimony to establish Dr. BM's qualifications as an expert witness.

Dr. BM testified that he subjected the appellant to a series of psychological tests when he first met with the appellant on 4–5 October 2004. Dr. BM subsequently met with the appellant on 19 June 2005, 23 June 2005, and 10 September 2005. He testified that, as of 17 September 2005, he still had not formulated a psychological diagnosis of the appellant. It was not until after the trial began that he concluded the appellant had an an Axis II diagnosis of a Personality Disorder Not Otherwise Specified. During direct examination at the hearing, he testified that he identified schizoid and borderline traits in the appellant. He also acknowledged telling the prosecution in an interview that the appellant displayed schizoid traits. However, during cross-examination, he changed his testimony stating the schizoid traits diagnosis

was inaccurate and that his actual diagnosis included paranoid and borderline traits. Trial defense counsel admitted to the court that he was surprised at Dr. BM's direct examination testimony given his previous discussions with him.

Due to the late diagnosis, change in diagnosis, and testimony from Dr. BM that additional tests were not administered, the Government argued for an independent psychological evaluation of the appellant. The defense objected. The military judge found Dr. BM's testimony admissible under *Daubert,* but reserved ruling on the independent psychological evaluation. Based on the unexpected problems exposed during Dr. BM's testimony at the *Daubert* hearing, the trial defense counsel concluded his ability to testify in the case had been compromised due to errors and inconsistencies between what he told the defense and the Government.

Sometime prior to the morning of 28 September 2005, the defense came to an agreement with the Government to avoid a court-ordered independent psychological evaluation. They agreed to allow Dr. CR, the Government's expert consultant, to conduct further testing of the appellant and to interview the appellant. The results of this further evaluation would only be revealed to the defense counsel, but they could potentially be revealed to the Government under limited circumstances. The appellant was thoroughly canvassed regarding his agreement to subject himself to this further voluntary evaluation with Dr. CR.

Trial defense counsel found that "Dr. CR's opinion countered Dr. BM's assessment on several points.... [Dr. CR identified] that Dr. BM had improperly read the results of at least one personality test ... [and Dr. CR] did not offer an opinion that would have assisted [the defense] at trial." At this critical stage in the proceedings, trial defense counsel decided they could not call Dr. BM as a witness and reevaluated their findings strategy, opting to proceed with their theory regarding the effects of adrenaline. As a result, all sides agreed upon a stipulation of expected testimony for Dr. BM.

At trial, the defense presented the testimony of Dr. RS, who testified regarding the physiological and psychological effects of stress, adrenaline, and alcohol on perception and memory. They further presented two stipulations of expected testimony. The first was from CC, the appellant's roommate, who testified that he received a voicemail message from SrA AS, in the early morning hours of 5 July 2004, telling him that the appellant had made a pass at his wife and wanting CC to call him back to talk about it. The second was from Dr. BM, who testified about the physiology of "fight or flight" and the cognitive effects of stress-induced release of epinephrine from the adrenal glands into the body. Specifically, he testified these adrenal gland releases can impair cognitive functions that guide behavior, thoughts, feelings, impulse control, judgment, decision-making, and insight. Finally, the defense introduced the curriculum vitae of Dr. RS; the curriculum vitae of Dr. BM; and a timeline of the phone calls made between the appellant, the victims, and related individuals on the night of 4 July 2004 and early morning of 5 July 2004. The defense then rested without presenting any of the evidence referenced in opening statement regarding the appellant's upbringing, life, family, or what brought him to the Air Force.

 "It is important for counsel to evaluate all of the evidence and determine the strategy that is most likely to be successful." *United States v. Christy*, 46 M.J. 47 (C.A.A.F.1997) (quoting *United States v. Fluellen*, 40 M.J. 96, 98 (C.M.A.1994)). This evaluation should include tactical decisions regarding which witnesses to call during the trial. In this case, those tactical decisions were made and included a reasonable strategy to call Dr. BM and the appellant's family members to help explain the mental health issues the appellant may have been experiencing at the time of the murders in an effort to dispel premeditation. While there may have been some risk in highlighting this anticipated testimony during opening statement pending a ruling on its admissibility, that risk was laid to rest when the military judge ruled the testimony admissible. To the extent the appellant argues that his counsel were deficient in the presentation of their opening statement, we disagree.

"A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Counsel's performance at the time the opening statement was delivered was based on a sound theory of the case developed over months of consultation with Dr. BM. We find no deficient performance by defense counsel in the content of his opening statement.

 Turning to counsel's decisions not to call the witnesses they told the members they anticipated hearing from, we again find no error. "[U]nexpected events at trial may lead to changed circumstances or different trial tactics." *Christy,* 46 M.J. at 50. This is exactly the scenario presented in this case. The record establishes the inconsistencies in Dr. BM's testimony at the *Daubert* hearing. The civilian trial defense counsel noted his surprise at the testimony in an Article 39(a), UCMJ, hearing. Counsel's affidavits sufficiently demonstrate their tactical quandary: calling an expert witness who had lost credibility and who had become somewhat unreliable, or limiting their presentation of witnesses, but still presenting some expert testimony as promised.

 The success of the strategy they chose is irrelevant. The question is whether their strategy was reasonable given an evaluation of "counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. We find the decision to limit Dr. BM's testimony to the effects of adrenaline and to present it in the form of a stipulation of expected testimony was reasonable. We also find that, under the circumstances, the decision not to seek the testimony of the family members, without the corresponding expert testimony from Dr. BM, was also reasonable, and conclude that such testimony would have likely been inadmissible. Thus, we find this theory of ineffective assistance of counsel to be without merit.

### 6. Witnesses' Sequestration

The appellant next claims that his counsel were ineffective during the findings phase of his trial by failing to move the court to sequester the family member witnesses. In a related issue, the appellant argues that the military judge committed plain error as well by allowing the family members and friends of the victims to remain in the courtroom during the entire trial. We will address these related issues together.

 The trial defense team's decision not to request the sequestration of the witnesses pursuant to Mil. R. of Evid. 615 was not an oversight. Rather, as discussed in an Article 39(a), UCMJ, hearing, it was a conscious decision. Both parties agreed that family members for both the appellant and the victims would be allowed to remain in the courtroom. The military judge acquiesced to this agreement between the prosecution and the defense.

The underlying purpose of Mil. R. Evid. 615 is to preclude witnesses from listening to the testimony of another witness in the trial, then shaping or conforming their subsequent testimony to match what was heard. *United States v. Langston*, 53 M.J. 335, 337 (C.A.A.F.2000) (citations omitted). The appellant has made no argument that the witnesses who remained in the courtroom without sequestration proffered findings testimony that was fabricated, tainted, or shaped in any way. In fact, JB (victim JS's father) was the first witness called by the trial counsel. As such, his testimony could not have been tainted in any way that could be deemed a violation of the policy behind Mil. R. Evid. 615. The second witness called to testify was DS, who gave limited testimony to identify his son, one of the victims, from a photograph. The record reflects no evidence that his testimony was altered in any way by his presence in the courtroom during the prior witness. The third witness was JPS, the wife of SSgt. JK. She was the first witness to testify as to her memory of what transpired on 4 July 2004. SSgt. JK was the last of the findings witnesses noted in the appellant's brief. A review of the record of trial belies any insinuation that either JPS's or SrA JK's tes-

timony was tainted by the testimony that preceded it.

As previously mentioned, to prevail on a theory of ineffective assistance of counsel, the appellant must demonstrate both prongs of the *Strickland* test: (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052; *Green,* 68 M.J. at 361. Thus, we may address these prongs in any order we choose. *Strickland,* 466 U.S. at 697, 104 S.Ct. 2052; *United States v. Loving,* 68 M.J. 1, 6 (C.A.A.F.2009).

We find that the appellant has failed to meet his burden of demonstrating prejudice based on his counsel's decision not to move for sequestration of the witnesses. As such, an ineffective assistance of counsel claim cannot be sustained.

 Turning to the related issue of the military judge's failure to *sua sponte* sequester the witnesses, we also find no error. To establish plain error by the military judge for allowing the witnesses to remain in the courtroom, the appellant bears the burden of demonstrating there was an error, the error was plain or obvious, and the error materially prejudiced the appellant's rights. *United States v. Miller,* 64 M.J. 666, 671 (A.F.Ct.Crim.App.2007); *United States v. Kho,* 54 M.J. 63, 65 (C.A.A.F.2005). Once the appellant persuades this Court of the plain error, the burden shifts to the Government to show the error was not prejudicial. *United States v. Powell,* 49 M.J. 460, 464–65 (C.A.A.F.1998). After review of the entire record, we find no evidence of error, plain or obvious, that violated the appellant's right to a fair trial. The military judge accepted the agreement of the parties with respect to the spectators, and we find no evidence that the appellant suffered a material prejudice to his substantial rights based upon the presence of the family members of the victims during the findings phase of this court-martial.

We also note that while these issues appear under the appellant's assignments of errors affecting the findings portion of the trial, the majority of the factual assertions regarding the emotional display of the victims' family members occurred during sen-

tencing. In lieu of addressing the lack of a motion for sequestration on grounds underlying the policy behind Mil. R. Evid. 615, the appellant instead really argues counsel was deficient because they should have anticipated and avoided the emotional displays by the aggrieved family members. Alternatively, the appellant argues that once emotions were displayed, the military judge's admonition to the spectators was insufficient and it amounted to plain error not to force sequestration at that point. Because these factual allegations took place during the sentencing phase of the court-martial, neither the spectator's conduct, whether prejudicial or not, nor counsel's performance, whether deficient or not, would have impacted the members' determination of guilt. Moreover, in light of our decision below to reverse the sentence on other grounds, we need not address the question of whether their presence and conduct had any prejudice with respect to sentencing.

### 7. Mental Health Issues

■ The appellant argues six different areas in which his trial defense counsel were ineffective with respect to the handling of mental health issues that arose during trial. The first of these claims is that counsel acted ineffectively by releasing statements made by the appellant contained within the full sanity board report to the Government.

Mil. R. Evid. 302(c)[7] clearly provides the accused protection from the disclosure of statements made during an examination performed pursuant to R.C.M. 706. This protection does not automatically translate into a corresponding prohibition on the part of the accused from voluntarily releasing statements for strategic or tactical purposes.

The appellant's allegation that the release of his sanity board statements "played a significant role in crippling their case" is unsupported and merely conclusory. The appellant's statements that were disclosed to the Government were not introduced to the

members, none of the witnesses' testimony was derived from the appellant's incriminating statements, and the appellant's statements were not the subject of any other testimony presented. As such, we find the appellant has not demonstrated how he was prejudiced by counsel's alleged error, thus he has not satisfied the second prong of the Strickland test. We do not address whether counsel's performance was deficient. See McConnell, 55 M.J. at 481.

■ The next four issues all stem from the trial defense counsel's decision to allow an independent evaluation of the appellant by Dr. CR, the Government's expert witness, and what the appellant believes would have happened had the military judge ordered an independent evaluation.

As previously discussed, unexpected things happened during the Daubert hearing that impacted the defense decision to have Dr. BM provide expert testimony. Dr. BM's direct examination testimony regarding his diagnosis of the appellant contradicted his previously stated diagnosis to trial defense counsel during consultation. This came as a surprise to the trial defense team, who had intended to use Dr. BM to establish a psychological diagnosis of the appellant that could have contributed to an inability to premeditate his actions. On cross-examination, the situation worsened when Dr. BM changed his testimony, indicating he had inaccurately stated his diagnosis during direct examination. However, the cross-examination revealed that he not only erred in stating appellant's diagnosis during direct examination, but also erroneously conveyed this inaccurate diagnosis to the prosecution during an interview in the days prior to his testimony. This unusual situation—arising in the middle of trial—left the defense team with questions as to what happened with Dr. BM and whether these obvious inconsistencies would degrade his credibility and their

---

7. Mil R. Evid. 302(c) states:

If the defense offers expert testimony concerning the mental condition of the accused, the military judge, upon motion, shall order the release to the prosecution of the full contents, other than any statements made by the accused, of any report prepared pursuant to

[Rule for Courts–Martial (R.C.M.)] 706. If the defense offers statements made by the accused at such examination, the military judge may upon motion order the disclosure of such statements made by the accused and contained in the report as may be necessary in the interest of justice.

theory of the case. Additionally, the Government asked for an independent evaluation of the appellant, given Dr. BM's testimony.

Viewing the strategic and tactical decisions of counsel in the light of the circumstances at the time of the decision, we find neither deficient performance nor prejudice after application of the *Strickland* test. *See Strickland,* 466 U.S. 668, 104 S.Ct. 2052. Trial defense counsel was placed between the proverbial rock and hard place after the *Daubert* hearing testimony. They had to decide whether to use Dr. BM as a witness during the findings phase, whether his credibility issues would hinder or help their theory of the case, and how to handle the Government's request for an independent evaluation of their client. While unorthodox, we cannot find the decision to allow their client to be evaluated by Dr. CR was deficient given the unique circumstances that arose mid-trial. Concern over Dr. BM's testimony and his credibility arose unexpectedly during the *Daubert* hearing, not due to the evaluation by Dr. CR. Attorneys may disagree with the approach taken, but counsel's performance here reflects strategic and tactical decisions that will not be second guessed by this Court. *See Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

Furthermore, the appellant agreed to this approach at the time of trial. He was present during the *Daubert* hearing, aware of Dr. BM's change in testimony regarding his diagnosis, and knew of the Government's request for an independent evaluation and the possibility of the military judge granting such request. The record fails to establish that he was inadequately advised by defense counsel. Instead, he was fully canvassed by the military judge regarding the approach and restrictions on Dr. CR's evaluation. The record of trial reflects he was in full agreement. His change of heart at the appellate level does not give rise to any relief.

The final issue presented in this area is that it was trial defense counsel's mishandling of the mental health issues that caused a "catastrophic decision" to abandon Dr. BM as a sentencing witness. While raised in the context of ineffective assistance of counsel during the findings phase of the trial due to

alleged mishandling of mental health issues, in reality this is a claim of ineffective assistance of counsel during sentencing. As stated below, this Court finds ineffective assistance of counsel during the sentencing phase on other grounds. Given our decision to remand the case for a new sentencing hearing, there is no need to further address the issue of failing to call Dr. BM as a sentencing witness.

In accordance with the analysis above, we find that the trial defense counsel were effective throughout the findings portion of the court-martial.

### B. Counsels' Performance in Sentencing

We now turn to the appellant's assignments of error affecting the sentencing phase of the case, specifically numerous allegations of ineffective assistance of counsel. We find merit in three issues the appellant raises: (1) his trial defense counsel failed to investigate evidence deriving from the appellant's hospitalization and subsequent behavioral changes after a motorcycle accident four months prior to the commission of the murders; (2) his trial defense counsel failed to investigate and obtain mental health records pertaining to the hospitalization of the appellant's mother at an inpatient mental health facility; and (3) his trial defense counsel failed to investigate and develop evidence of remorse through Deputy Sheriff LF.

When the issue is the adequacy of counsel's investigatory efforts for the sentencing phase of a capital trial, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made." *Rompilla v. Beard,* 545 U.S. 374, 381, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052). To assess the thoroughness of counsel's investigative efforts, this Court must review performance for "reasonableness under prevailing professional norms." *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052).

The Supreme Court has historically noted that the ABA Standards for Criminal Justice are good guidelines for assessing "prevailing

professional norms" and determining what is reasonable. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052; *Williams v. Taylor,* 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527; *Rompilla,* 545 U.S. at 387, 125 S.Ct. 2456. Although these standards are instructive, it is important to note, as we did earlier, that they are not mandated for military defense counsel. *United States v. Murphy,* 50 M.J. 4, 9 (C.A.A.F.1998) (citing *Loving,* 41 M.J. at 300), *quoted in Loving v. United States,* 68 M.J. 1, 19–20 (C.A.A.F. 2009) (Effron, C.J., concurring). With respect to investigative efforts, Guideline 10.7 of the ABA Guidelines sets forth that "[c]ounsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." *Id.* at 76. The Commentary to Guideline 10.7 states counsel need to explore medical history, including hospitalization, mental illness, family history of mental illness, physical injury, and neurological damage. *Id.* at 81. Guideline 10.11 also sets forth an ongoing duty of counsel to "seek information that supports mitigation or rebuts the prosecution's case in aggravation." *Id.* at 104.

■ In *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court concluded:

> [T]he Eighth and Fourteenth Amendments [8] require that the sentencer ... not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

■ Similarly, the sentencer may not "refuse to consider, *as a matter of law,* any relevant mitigating evidence." *Eddings v. Oklahoma,* 455 U.S. 104, 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). These well-established rules carry the corollary inference that counsel should be seeking to investigate and develop any evidence which might mitigate against the appropriateness of the death penalty. In *Wiggins,* the Supreme Court focused on trial defense counsel's investigation and stressed that counsel, in most cases, must pursue all reasonable leads. *Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527.

The case at hand is not one in which trial defense counsel shirked their responsibility to conduct an investigation into the appellant's family and social history, upbringing, or history of mental illness or utterly failed to present a case in mitigation and extenuation. To the contrary, prior to the Article 32, UCMJ, 10 U.S.C. § 832, investigation, trial defense counsel secured the services of a professional mitigation specialist, CP, whose role was to:

> collect any and all records regarding a criminal defendant [and] interview friends, family members, co-workers, acquaintances, teachers, therapists, social workers, medical doctors, and anyone who has had contact with the defendant
>
> . . . .
>
> obtain all discovery materials from defense attorneys, law enforcement agencies [sic] documents, previous criminal history records of the defendant, all records from the jail, autopsy report, crime scene pictures and videos, defendant's audio and/or videotaped statement, indictment as well as factors that the state intends to use as aggravating factors, [and]
>
> . . . .
>
> research, obtain, evaluate and coordinate the use of any and all information from the life of the defendant that may serve in the process of mitigation.

From August 2004 until 13 October 2005, when the sentence was announced, CP "collected thousands of pages of documents related to Andrew Witt and interviewed approximately a hundred individuals with the goal of understanding the crime as well as the person of who Andrew Witt was." The trial defense counsel also retained a forensic psychologist, Dr. BM, prior to the Article 32, UCMJ, investigation.

The question presented at this point is whether, despite the assistance of a mitigation specialist and forensic psychologist, trial defense counsel's investigation into mitigat-

---

**8.** U.S. Const. amend. VIII, XIV.

ing evidence fell short of the performance expected by reasonably competent counsel. We address the three issues we find meritorious in turn.

### 1. Motorcycle Accident Injury

■ The appellant asserts trial defense counsel were ineffective when they failed to investigate and develop potential mitigation evidence resulting from a motorcycle accident. The motorcycle accident occurred approximately four and a half months prior to the commission of the murders and attempted murder for which the appellant was found guilty. Specifically, the appellant argues counsel was remiss in failing to further investigate whether the appellant's closed head injury may have resulted in traumatic brain injury. There is no question that the record is silent with respect to any evidence of this motorcycle accident.

■ "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla,* 545 U.S. at 383, 125 S.Ct. 2456 (citing *Wiggins,* 539 U.S. at 525, 123 S.Ct. 2527). However, competent counsel must undertake a certain threshold of investigation by being reasonably diligent prior to making the strategic decision to "draw [the] line." *Id.*

Further, as the Supreme Court pointed out:

[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

Thus, with respect to this issue, the focus is not whether trial defense counsel acted reasonably in not presenting evidence of the motorcycle accident and closed head injury to the court-martial panel. Rather, the focus of this issue is whether the decision of trial defense counsel to limit the scope of their pretrial investigation into potential mitigating evidence stemming from that motorcycle accident was itself reasonable. To analyze the decisions of counsel in this case, an extensive timeline of events is necessary.

In August 2004, the mitigation specialist sent a memorandum to the appellant's military trial defense counsel strongly recommending a full battery of psychological testing. She further conveyed her opinion that they had a responsibility to pursue any possible brain damage due to the closed head injury from the motorcycle accident and reported changes in behavior since that time. She conveyed to the trial defense counsel that this was an important area of inquiry. She described her experience with closed head injuries and how often times such an injury can explain aberrant behavior. She made clear her recommendations for further investigation, neuropsychological testing, and brain scanning.

In October 2004, the defense forensic psychologist consultant, Dr. BM, conducted a series of psychological and neuropsychological tests on the appellant, but he had not yet reached any diagnosis. At that time, he had only met with the appellant twice: once on 4 October 2004, when he interviewed the appellant for approximately 5–6 hours, once on 5 October 2004, when he spent an additional 7–8 hours conducting tests with the appellant and generated two pages of notes. It is unclear when the tests were actually scored, but the next two meetings with the appellant were not until June 2005.

Between October 2004 and June 2005 the mitigation specialist continued to insist on further neuropsychological testing and brain imaging to determine whether there was any evidence of traumatic brain injury. She specifically recommended consultation with Dr. FW, who specialized in this area.

In November 2004, approximately eleven months prior to the sentencing phase of the

appellant's court-martial, Maj JW, a military defense counsel not otherwise involved in the case, sent the appellant's civilian trial defense counsel an email referencing a prior conversation about an article on brain scans, included the website link for the article, and offered to fax the article. The article was entitled, *"Mr. Chiesa's Brain: Can High–Tech Scans Prove That Criminal Acts are the Result of a Damaged Brain?"*

The appellant had three trial defense counsel working on his case. The lead counsel was a civilian trial defense counsel with no previous experience defending capital murder cases, but with extensive experience defending military cases. Neither of the appellant's detailed military counsel had prior experience defending capital murder cases. All of the trial defense counsel were aware of the appellant's motorcycle accident four and a half months prior to the murders. Counsel were in possession of the appellant's medical records pertaining to treatment following the accident and a pretrial sanity board report that briefly discussed the closed head injury. Both of the sources reflected the appellant's loss of consciousness at the time of the injury. The mitigation specialist obtained the damaged motorcycle helmet and gave it to trial defense counsel as a possible exhibit for trial. She further revealed the appellant's roommate's observations of a change in the appellant's behavior following the motorcycle accident. He described these changes as being more outspoken, not putting up with anything anymore, and observing the appellant in a fight for the first time after the motorcycle accident.

At some point, the defense team asked Dr. BM about the mitigation specialist's suggestion that additional testing and inquiry into the possibility of traumatic brain injury be conducted. He ultimately advised the trial defense counsel that he saw no value to be gained by conducting further neuropsychological testing. He opined that additional testing would not provide any more information than they already had and that the accident and concomitant injuries were not the source of the appellant's behavior or an explanation for his actions. Counsel indicated that they "knew the [G]overnment would

likely fund whatever relevant expert or testing [they] requested."

Despite the mitigation specialist's insistence on consultation with a neuropsychologist and completion of additional brain scanning, trial defense counsel did not consult with the recommended neuropsychologist, did not request additional brain imaging, and did not interview further witnesses with respect to the motorcycle accident. Instead, trial defense counsel assert that they did not continue investigation into this area because they relied upon the advice of a forensic psychologist consultant, who, in contradiction to the mitigation specialist, opined there was "no value to be gained by conducting further neuropsychological testing," and "additional testing would not provide ... any more information than [they] already had."

We find trial defense counsel's performance unreasonable, as it falls below that of reasonably competent counsel. An analysis of counsel's perspective at the time reveals a quantum of evidence already known that would lead a reasonable attorney to investigate further. *See Wiggins*, 539 U.S. at 527, 123 S.Ct. 2527. Trial defense counsel chose to forego investigation into the possibility of traumatic brain injury, despite conflicting expert opinions, a lack of any diagnosis yet that would provide explanation for the appellant's behavior, independent information from appellate defense counsel highlighting the possibility of a correlation between a closed head injury and criminal acts, and noted behavioral changes in appellant following the accident.

■ Ultimately, the responsibility to investigate potential leads into mitigating evidence lies squarely on counsel. While counsel may and should, to a degree, rely on the expertise of their expert consultants, they may not delegate their decisions. Only once either the expert or counsel has consulted all readily available sources can counsel's reliance on the expert's opinion be reasonable. *Wilson v. Sirmons*, 536 F.3d 1064, 1089–90 (10th Cir.2008). Counsel must also consider all known facts and circumstances and must pursue all reasonable leads.

Here, counsel describe their lack of investigation into the appellant's closed head injury

occurring four months prior to the murders as a reasonable reliance on the advice of their forensic psychologist's opinion that such an investigation was not necessary. They further characterize their decision not to present the known evidence of this motorcycle accident, the closed head injury, and the subsequent behavioral changes as a "tactical decision." The trial defense counsel reasoned that they "would lose credibility if [they] tried to make something of [the motorcycle accident] that the experts could not justify."

Given the evidence outlined above, we find a reasonable attorney would have investigated this issue further. In essence, there was no tactical or strategic decision not to pursue this lead. Instead, there was simply a decision not to investigate the impact of the head injury because one of two experts believed the quest would be fruitless. Thus, counsel's lack of investigation falls short of providing effective assistance of counsel within the meaning under *Strickland* and the Sixth Amendment.

Not only was the original decision not to investigate this known lead into potential mitigating evidence unreasonable, but there were also ample red flags raised during trial that should have caused a reasonable attorney to reevaluate their reliance on Dr. BM's previous advice. Once Dr. BM acknowledged his own inconsistencies and Dr. CR challenged the accuracy of Dr. BM's analysis, trial defense counsel had a duty to reevaluate the case, their strategy, and anticipated presentation of evidence for both the findings and sentencing portions of the case. Given the only rationale for failing to pursue this known lead into potential mitigating evidence was the opinion of Dr. BM, it was unreasonable to adhere to this course of action once the errors and inconsistencies with Dr. BM's evaluation of the appellant were exposed. The situation was exacerbated with the decision not to use Dr. BM at all in sentencing.

Dr. BM's issues came to light during the *Daubert* hearing on 26 September 2005. The presentencing phase of the court-martial did not begin until 6 October 2005, leaving sufficient opportunity to reevaluate the prior reliance on Dr. BM's opinion. Faced with this predicament, counsel chose to proceed to sentencing without their anticipated psychological testimony that the appellant's "historical familial experiences had shaped [his] mental status and contributed to the thought processes in play the night of the incident."

Although the appellant may now question the decision not to present testimony from Dr. BM, as analyzed previously in addressing the findings phase issues, we find this decision tactical and strategic under the unusual circumstances presented. Dr. CR was not a substitute for Dr. BM's anticipated testimony. Instead, his evaluation was intended to avoid the court-ordered evaluation and ultimately confirmed Dr. BM's deficiencies with respect to his diagnosis of appellant. However, it is not clear that Dr. CR was ever specifically asked about the motorcycle accident and the possibility of traumatic brain injury. Civilian trial defense counsel stated, "Dr. [CR] did not indicate in any way that the motorcycle accident caused trauma that would be relevant to either our defense on the merits or to sentencing." There was plenty of time to follow up on the reasonable leads previously known but not investigated. Counsel never requested a continuance or delay, and there is no evidence that they conducted any subsequent investigation into this known alternative explanation for the appellant's behavior.

The constraints placed on this potential lead were also unreasonable in light of what appellate defense counsel actually discovered and the ease with which this evidence could have been obtained. Had trial defense counsel simply contacted Dr. FW, as insisted upon by CP, they would have discovered the following: the sole CT scan done immediately after the accident could not exclude a traumatic brain injury because an immediate CT is mostly sensitive to acute bleeding rather than the longer term consequences of a traumatic brain injury; a review of Dr. BM's testing results plainly suggested left hemisphere damage; the behavioral changes following the accident and the appellant's uncharacteristic behavior on the night of the homicides are highly typical of the impairment in emotional self-regulation and impulse control that results from left anterior

temporal lobe damage; even mild traumatic brain injury can affect impulse control, normal cognitive functions, emotional self-regulation, and behavior; based on known evidence, Dr. FW would have expected proper scanning to show the appellant suffered from traumatic brain injury; and, even without additional testing, Dr. FW could have given helpful and relevant testimony concerning the possibility of traumatic brain injury in the appellant.

Finally, the unreasonableness of not exploring the leads with respect to traumatic brain injury was amplified by the lack of any other mitigation or extenuation evidence that may have shed light on why this aberrant behavior transpired. After Dr. BM was rendered unavailable and Dr. CR's independent evaluation revealed nothing helpful to the appellant's strategy in sentencing, the defense was "left without what we had viewed would be helpful psychological testimony and forced to rely entirely upon evidence from SrA Witt's friends and family." This loss of psychological testimony rendered the defense strategy hollow and ineffective against the Government's argument that these crimes were committed because he is evil and some people are just bad.

### 2. Mental Health Records of the Appellant's Mother

■ The appellant also asserts that his trial defense counsel were ineffective when they failed to investigate his mother's mental health history and obtain his mother's mental health records from an inpatient stay.

As discussed above, trial defense counsel's rationale for not pursuing the known lead of possible traumatic brain injury was because Dr. BM did not believe the accident contributed to the incident. Instead, trial defense counsel acknowledged their theory of the case, based upon Dr. BM's evaluation, was that the appellant's actions were directly influenced by his historical familial experiences, childhood, and the manner and environment in which he was raised. At least one of the trial defense counsel acknowledged that "as part of the case theory rested on Dr. [BM]'s assessment of [MP]'s past mental health concerns ... we would have wanted these records." However, none of

the trial defense counsel presented any tactical, strategic, or other reason as to why investigation into this known lead was not pursued. In addressing the issue, civilian trial defense counsel stated, "To the extent we did not seek [MP]'s mental health records, in my mind it was simply that Dr. [BM] did not ask us to obtain them. Had he done so, we would have had trial counsel obtain them." However, the professional mitigation specialist recommended they obtain the records. Civilian trial defense counsel's statement leaves the impression that the trial defense counsel inappropriately attempted to delegate the decisions regarding diligent investigation to their expert. None of the trial defense counsel has offered any reasonable explanation for why the records, which were relevant to their stated theory of the case, were not sought.

■ Counsel may not simply hire an expert and then abandon all further responsibility. Counsel ultimately has the obligation to perform as reasonably diligent counsel and to ensure adequate preparation and investigation for the sentencing phase. It is the attorney who bears the "responsibility to investigate and bring to the attention of mental health experts who are examining his client, facts that the experts do not request." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir.1999).

Counsel were aware of the appellant's mother's history of depression. When the appellant was in the eighth grade, his mother decided to check into the Minirth Meier Clinic, a Christian Counseling Clinic in Wheaton, Illinois, for a couple of weeks while the appellant's father stayed home with the children, including the appellant. What trial defense counsel would have discovered upon further investigation were eight pages of a psychological evaluation and discharge summary for the appellant's mother conducted in September 1996 during her seventeen day hospitalization for depression. The psychological evaluation corroborates much of the testimony of the appellant's family presented during sentencing and reveals that the appellant's mother was of average intelligence; a college graduate; had no issues with alcohol or drug abuse; was actively involved with

her church; and suffered from the stress of homeschooling her children, strained interpersonal relationships, and depression. It further corroborates that the appellant's biological father used alcohol and drugs, and he also physically abused the appellant's mother during the three years they were married. The evaluation also summarizes an abusive household during her adolescence, a suicide attempt by her mother during her junior high school years, and displacement from home during high school. Her discharge diagnosis included an Axis I diagnosis of Major Depression, recurrent, and severe Somatization Disorder NOS. She was also given an Axis II diagnosis of borderline and paranoid traits. It must be noted this is the same Axis II diagnosis Dr. BM ultimately gave to appellant. The recommendations following her discharge were for medication; education about personality features and paranoid features; to discontinue homeschooling; and for ongoing outpatient individual therapy. There is no information whatsoever from the psychological evaluation that indicates any direct impact of her bout of depression on the appellant.

We hold that trial defense counsel's efforts to investigate the appellant's family history of mental disorder were deficient. We base our opinion on their knowledge of the appellant's mother's mental health history, the recommendation of the professional mitigation specialist to obtain the records, the theory of the case propounded by their expert forensic psychologist, and the ABA Guidelines. The performance of counsel in failing to obtain these pertinent records or investigate this known lead of an inpatient mental health stay fell below the standards of competent counsel.

### 3. Evidence of Remorse

■ The appellant further asks this Court to find ineffective assistance of his trial defense counsel for failing to investigate the potential remorse testimony of Deputy Sheriff LF. In applying the *Strickland* standard for ineffective assistance of counsel, we again must review the adequacy of counsel's investigation for the presentencing hearing discounting hindsight by evaluating " 'counsel's perspective at the time' investigative deci-

sions [were] made." *Rompilla,* 545 U.S. at 381, 125 S.Ct. 2456 (citing *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052).

At least one of the appellant's military trial defense counsel witnessed the appellant become extremely upset during the pretrial Article 32, UCMJ, hearing, when he saw the crime scene evidence for the first time. The appellant began to cry and was consoled by Deputy Sheriff LF during a subsequent recess. Ultimately, he did not return to the proceeding that day. Counsel concedes the mitigation specialist recommended pursuing Deputy Sheriff LF as a potential witness and remembers asking her to obtain his contact information. While this counsel did not recall ever receiving the contact information or attempting to make any contact with the sheriff on his own, he does acknowledge they "were very interested in presenting any evidence of remorse [they] could find, as well as evidence that showed [the appellant]'s good conduct since his confinement. In [that counsel's] opinion, Deputy [LF] could have been a good witness on both issues." The civilian trial defense counsel offers speculative comments in general about his lack of confidence in potential law enforcement witnesses. However, he provides no factual basis from which he assessed Deputy Sheriff LF's potential as a witness or susceptibility to cross-examination.

Trial defense counsel did not effectively investigate Deputy Sheriff LF as a potential mitigation witness. From the record, it appears that any decision not to interview him or call him as a witness was, at best, arbitrary. Counsel did not interview Deputy Sheriff LF, evaluate his potential testimony, observe his demeanor as a potential witness, or investigate possible impeachment material. We conclude that trial defense counsel's uninformed decision is not objectively reasonable and is, in our view, constitutionally deficient.

### C. Prejudice

■ Having found deficient performance in trial defense counsel's failure to investigate the areas discussed above, we must now turn to the issue of prejudice. To prevail on an ineffective assistance of counsel claim, the

appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. If the ineffectiveness occurred during the sentencing phase, the defendant must demonstrate "a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. 2052.

■ There is no question that the underlying facts of this case present a strong case in aggravation. Overall, the presentation heavily focused on significant emotional victim impact evidence and a purported callousness or lack of remorse by the appellant. The Government argued, in part, that the appellant committed these offenses because he was "evil" or "just bad."

Evidence presented by the prosecution during the presentence hearing included the appellant's personal data sheet and enlisted performance reports, photographs, and a series of letters written by the appellant to Ms. SF, a high school youth volunteer at the appellant's church. The letters, in part, commented about the lack of fairness to him, given his incarceration, and anger at God for letting this happen.

Additionally, a great deal of emphasis was placed on the victim impact by way of testimony from 14 friends and family members of the victims, SSgt. JK, and Dr. CR. Dr. CR evaluated the family members of the victims and testified on his diagnoses of mental health issues ranging from bereavement and anxiety disorder, to major depression, depressive disorder, and post-traumatic stress disorder.

Finally, the prosecution submitted five stipulations of expected testimony from various witnesses demonstrating the appellant's lack of remorse. Four of these witnesses were friends of the appellant whose expected testimony revealed, on the day following the offenses, the appellant was talking to them on the telephone at various times and making plans for lunch, dinner, and meeting for drinks on 5 July 2004. One of these witnesses, the appellant's roommate, also referenced a comment from the appellant on 5 July 2004 that "[AS] didn't want to be friends anymore." Additional stipulated expected testimony was when they drove by the crime scene on 5 July 2004, the appellant said, "I can't be here, I have to go," and began to get out of the vehicle. This was just prior to the appellant's detention.

The last stipulation of expected testimony presented was from Dr. M. He was SSgt. JK's treating surgeon. His expected testimony outlined the extensive damage SSgt. JK had to his internal organs, the multiple surgeries required to treat his injuries, and the significant scarring as a result of the crime and medical intervention.

On the mitigation side of the scale, trial defense counsel called 15 witnesses, including the appellant's family members, friends, teachers, coach, church volunteers, and former employer, who testified that the appellant was a respectful, happy, polite young man who was never violent. He was described as a good big brother who was raised in a restrictive, over-protective home with strong religious beliefs. Although he was depicted as having limited social skills, he was socially active in basketball, football, golf, and jazz band during his high school years. The witnesses expressed their understanding of the crime committed and their willingness to extend the appellant their ongoing love and support. The majority of these witnesses knew the appellant during or prior to high school. The defense also introduced 22 character letters in support of the appellant, 12 certificates of awards and decoration, 28 exhibits regarding his educational history, including reports cards dating back to middle school, 16 pages of photographs, and a four-page unsworn statement. The mitigation evidence presented the appellant as a good human being who showed some remorse, but lacked any explanation as to why the appellant committed these crimes.

The overarching goal of the defense in a capital case is to present the best and most

thorough mitigation case available to weigh against the aggravation evidence. If there is not a unanimous vote among the members that the aggravation evidence outweighs the mitigating evidence, then the death penalty may not be imposed. For these reasons, mitigation specialists are sought, consulted, and made part of the defense team. Mitigating factors can include humanizing evidence, evidence of remorse, family history, medical history, and mental health history among others. In this case, the mitigation case considered by the members was, for the most part, limited to humanizing evidence that showed a good person from a religious home. The mitigation evidence counsel failed to discover or investigate that could have been presented included evidence of the appellant's mother's mental health diagnosis; evidence of a significant display of remorse during and after the Article 32, UCMJ, hearing; evidence of a closed head injury from a motorcycle accident resulting in behavioral changes; and mental health testing with some findings consistent with traumatic brain injury that could have provided explanatory evidence for why this tragic event happened.

■ Courts have repeatedly found evidence of mental problems, arguably including the effects of traumatic brain injury, to be powerful mitigation. "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to ... emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (quoting *California v. Brown,* 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O'Connor, J., concurring)), *overruled on other grounds by Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002); *see also Allen v. Woodford,* 395 F.3d 979, 1006 (9th Cir. 2005) (noting that "explanatory" mitigating evidence often bears more weight than "humanizing" evidence); *Cannon v. Gibson,* 259 F.3d 1253, 1277–78 (10th Cir.2001) (finding omitted mitigation information of "serious brain damage" and lack of impulse control would have displaced mitigation information portraying the petitioner as a "kind, compli-

ant, and responsible individual whose involvement in the murder was an aberration").

Given the extent to which the appellant's mother's mental health history and upbringing was presented to the members, this Court finds very little new information that would have been discovered by obtaining the Minirth Meier New Life Clinic records. The one new area that was not previously known was the Axis II diagnosis of borderline and paranoid traits appearing in the discharge summary. This mirrors the diagnosis Dr. BM finally rendered for the appellant and it is possible this information would have been helpful to him. However, due to the errors in his scoring that led to his conclusions and the inconsistencies in his testimony, it is impossible for us to determine what, if any, impact the discovery and potential presentation this evidence would have had. Given the status of the case, Dr. BM was unable to even present his diagnosis and theory due to his diminished credibility following the *Daubert* hearing.

There is no question that trial defense counsel desired to present remorse evidence in mitigation. The record reveals a concerted effort on the part of the prosecution to paint a picture of the appellant as lacking in remorse. Surely, trial defense counsel were aware of this strategy, as they successfully avoided the live testimony of multiple witnesses by entering into stipulations of expected testimony. These witnesses all presented evidence of the appellant making social plans for 5 July 2004, the day following the murders.

Likewise, the record reflects some effort to counteract the Government's evidence by presenting some evidence of remorse. Of the 15 defense witnesses, only three presented any remorse evidence. The first was Ms. SF, who testified that she had received approximately six letters from the appellant while he was in custody and that they conveyed "a tone of remorse." However, she was extensively cross-examined on specific passages from those letters that were not expressive of remorse and the letters were ultimately introduced into evidence by the Government. The second witness was Mr.

RJ, a former employer of the appellant, who testified that he received one letter from the appellant and believed "he was remorseful of what he has had [sic] done." The appellant's father testified that in phone calls with the appellant, "he was so full of guilt and remorse, [and] self-loathing that it took all [his] strength [voice shaking] sometimes to get him up and maybe make him laugh. Some of the phone calls were so exhausting that [he] would actually spend the next day in bed. They were just so painful." Only one of the numerous character letters admitted by the defense at sentencing reflected a showing of remorse by the appellant. Finally, the appellant expressed his remorse both in his oral and written unsworn statements.

Had Deputy Sheriff LF been contacted, the defense would have learned the content of his testimony. His written declaration submitted on appeal, not only expresses a conclusion that the appellant was remorseful, but paints a powerful image of a young man broken down by remorse.

Deputy Sheriff Foster's declaration contains, in part, the following passages:

3. During this Article 32 hearing, I witnessed [Senior Airman (SrA)] Witt overcome by emotion. When the prosecution presented its evidence against SrA Witt, he broke down and sobbed uncontrollably. This happened, in particular, when crime scene photos were displayed. I saw a broken young man, in great pain and despair. He was so emotionally overcome that he had to excuse himself from the hearing.

4. I accompanied SrA Witt to another part of the courthouse while the hearing continued. He continued to display sadness and great emotion. I took it upon myself to give him comfort and spiritual guidance. I wrapped my arms around him to give him a hug. I whispered words of encouragement to him in hopes of consoling him. I wanted him to know that he was walking with God. I told SrA Witt that God loved him and that I loved him. I interpreted SrA Witt's emotion to be genuine and sincere. I would not have approached him otherwise. I believe he was remorseful for what he had done.

. . . .

8. If I had been asked to testify on behalf of SrA Witt, I would have done so. I would have told the court-martial about my interaction with him during his Article 32 hearing, our spiritual discussion, and my observations of his emotion and remorse. In my experience in law enforcement, I have dealt with numerous murderers, rapist, and other violent criminals. I have never testified on behalf of any of them. Only one other time did I observe the emotion and remorse, and sincerity of such, like I did of SrA Witt in another defendant.

9. However, I never spoke to any of SrA Witt's attorneys.

None of the other remorse evidence presented came close to the picture painted by Deputy Sheriff LF.

The record also reveals the panel's keen interest in the appellant's remorse, as reflected when one court member presented questions to Mr. RJ about the remorse he gleaned from the appellant's letter.[9]

Finally, the record is silent as to any evidence of the appellant's motorcycle accident, behavior following the accident, or any impact the closed head injury from the accident may have had on his brain function and behavior.

In this case, additional mitigating evidence that could have been presented included medical records from the motorcycle accident. Medical records would have established that in mid-February 2004, the appellant was involved in a motorcycle accident where he suffered a closed head injury that

---

9. The court member probed the issue of remorse as follows:

Q. Okay. You indicated that you believed from the tone of [SrA] Witt's letter that he was remorseful. What was it about the tone of that letter that—first of, let me ask you, did he actually say that he was remorseful?

A. No, he did not.

Q. Okay. But it's from the tone of the letter, the entire letter, that gave you that appreciation of your belief that he was remorseful?

A. Yes, it did.

rendered him temporarily unconscious. He rode his motorcycle onto the base following the accident and was observed bleeding over his left eye, walking in a slow and cautious manner, confused, disoriented, and delayed in his verbal responses to questions, and speaking uncharacteristically slow. He was driven to the hospital, where he was treated and released. A CT scan conducted at the time was unremarkable. Dr. FW would have testified that a CT scan is mostly sensitive to acute bleeding and not to longer term consequences of traumatic brain injury. The accident and medical findings would have been corroborated by the damaged helmet the defense had in their possession. Testimony from his roommate would have noted a change in the appellant's behavior following the accident. He noticed that the appellant became outspoken and wouldn't put up with anything anymore. The roommate also saw, for the first time, that the appellant got into a fight during this four-month period between the accident and the crimes in question. Dr. FW would have presented evidence to the members that the neuropsychological testing conducted by Dr. BM showed important findings suggesting left hemisphere brain damage and displayed symptoms typical of left, anterior, temporal lobe damage. If damaged or diseased, this region of the brain is also often implicated in disinhibited emotional and aggressive behavior. Essentially, this mitigating evidence could have provided the explanation evidence otherwise lacking in the appellant's presentation.

Thus, this undiscovered mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of the appellant's moral culpability. *Wiggins,* 539 U.S. at 538, 123 S.Ct. 2527 (quoting *Williams,* 529 U.S. at 398, 120 S.Ct. 1495). It would have considerably added to the mitigation evidence actually presented and would have served to counteract some of the aggravating evidence. As such, we find that had the members been confronted with this additional mitigating evidence, there is a reasonable likelihood that at least one member would have struck a different balance between the aggravating and mitigating factors and would have returned with a different sentence.

Having found both constitutionally deficient performance as well as prejudice, we reverse the sentence in this case and remand for a new sentencing hearing.

## IV.

### Additional Sentencing Issues

The appellant raises several other issues relating to the sentencing portion of the court-martial, some of which we address below. We do not address all issues in light of our decision to remand this case for a new sentencing hearing, rendering some issues moot and others not yet ripe for consideration.

### A. Sentencing Argument

 The appellant asserts that trial counsel's comments during the sentencing argument were improper in that they misled the jury to believe that the responsibility for the ultimate sentencing decision lay elsewhere. His position with respect to this issue relies upon the Supreme Court's decision in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which held that the jury must not be misled regarding the role it plays in the sentencing decision. However, the decision in that case was a plurality opinion where Justice O'Connor was the concurring vote on grounds narrower than the plurality. The Supreme Court has since held "her position is controlling." *Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). Therefore, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Id.* (alteration in original) (quoting *Dugger v. Adams,* 489 U.S. 401, 407, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989)) (internal quotation marks omitted).

After full review of trial counsel's comments during the sentencing argument, we do not find that the comments were false, inaccurate, or misleading. The argument accurately pointed out, in three passing comments, that there is an appellate process following the verdict, but did not contravene

the principle established in *Caldwell* as limited by the concurring opinion.

### B. Military Judges Instructions

■ The appellant argues that the military judge erred on several instructional matters. Whether a military judge properly instructs the court members is a question of law we review de novo. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F.2003) (citation omitted). A military judge's decision to give, or not give, an instruction is reviewed for an abuse of discretion. *United States v. Maxwell*, 45 M.J. 406, 424 (C.A.A.F.1996) (citation omitted).

As previously mentioned, we review new issues raised after a failure to object at trial for plain error, which requires (1) error, (2) that is plain or obvious, and (3) that impacts a substantial right of the appellant. *See Kho*, 54 M.J. at 65; *United States v. Finster*, 51 M.J. 185, 187 (C.A.A.F.1999) (citing *Powell*, 49 M.J. at 463). The appellant bears the burden of persuading this Court of the plain error, after which the burden shifts to the Government to show that error is not prejudicial. *Powell*, 49 M.J. at 464–65.

■ When the sufficiency of instructions is attacked, "[t]he ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner .... there is a heightened

need for reliability in capital punishment cases." *Loving*, 41 M.J. at 277–78 (brackets in original) (internal quotation marks and citation omitted). On this issue, our superior court has noted that appellate service courts have plenary review authority and "a clearer carte blanche to do justice would be difficult to express." *United States v. Claxton*, 32 M.J. 159, 162 (C.M.A.1991) (citations omitted).

With these concepts in mind, we review the military judge's instructions in three areas.

### 1. Voir Dire Reference to Sentencing Procedure

■ During voir dire, the military judge instructed the members that the death penalty was a potential sentence only if the members convicted the appellant of premeditated murder by a unanimous vote. As part of that instruction, the military judge advised the members that the accused was presumed innocent; the Government had the burden to prove his guilt beyond a reasonable doubt; and, since death was a possible punishment option, it was necessary to ask them questions about their views on the death penalty during voir dire. The judge cautioned that the inquiry into their views on the death penalty "has no relation at all to whether the accused is guilty or not guilty of any offense." [10] The appellant argues that the mili-

---

10. The military judge instructed the members using the standard preliminary instructions for death penalty cases set forth in the Department of the Army Pamphlet 27–9, *Military Judges' Benchbook* [hereinafter *Benchbook*], ¶ 8–3 (1 April 2001). The military judge instructed the members as follows:

And before I ask you questions or let counsel do so, it's appropriate that I give you some additional instructions.

This is a capital murder case. I want to direct your attention specifically to Specifications 1 and 2 of Charge I, on the copy of the charges that you have there. Both are a violation of Article 118 of the Uniform Code of Military Justice commonly referred to as premeditated murder. If the accused is convicted of premeditated murder by a unanimous vote, then the court may, but is not required to, impose the death penalty. In the sentencing phase of this trial the death penalty is a permissible punishment only if:

One, the court members unanimously find beyond a reasonable doubt that an aggravating factor exists;

Two, that the court members unanimously find that any and all extenuation and mitigation circumstances are substantially outweighed by any aggravating circumstances to include any aggravating factor. If you unanimously find these two items, then the death penalty will be a possible punishment, but only if you vote unanimously to impose death.

You must bear in mind that even if the death penalty is a possible sentence, the sentence or whether or not to vote for the death penalty is within the sole discretion of each court member. If the accused is convicted of premeditated murder, but the vote for conviction was not unanimous, then the death penalty may not be adjudged. However, you will be required to determine whether the mandatory minimum of life imprisonment or whether confinement for life without the eligibility for parole will apply. Should it become necessary, I'll explain your options to you in much greater detail later in this trial.

Remember, as I previously instructed you, the accused is presumed to be innocent and

768

tary judge committed plain error in so instructing the members because knowing about the unanimity requirement "undoubtedly influenced" the members' findings deliberations.

We find the military judge did not commit error, plain or otherwise. The military judge acted appropriately when he instructed the members during voir dire that death was a potential penalty only by unanimous vote. By doing so, the military judge ensured that the members who sat on the appellant's court-martial panel were free from conflict and bias. *United States v. Gooch*, 69 M.J. 353 (C.A.A.F.2011). The questioning of panel members allows the parties to intelligently exercise challenges for cause and peremptory challenges. R.C.M. 912(d), Discussion ("The opportunity for voir dire should be used to obtain information for the intelligent exercise of challenges."). An inelastic predisposition towards a particular punishment is a valid basis for a challenge for cause. R.C.M. 912(f)(1)(N), Discussion; *see United States v. Sonego*, 61 M.J. 1, 4 (C.A.A.F.2005). This is especially true in a capital case. *See Gray v. Mississippi*, 481 U.S. 648, 658, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987) (finding the test for the removal of a juror who opposes the death penalty is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (quoting *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985))).

We also disagree that knowledge of the unanimity requirement would have influenced the members during their findings deliberations to the prejudice of the appellant, and the appellant offered no insight into how this may have influenced the members other than to say that it did so "undoubtedly." We refuse to speculate on this matter. What we do know is that the military judge told the members that it was necessary to ask them questions about their views of the death penalty because the appellant was charged with a capital offense. Using the Benchbook in-

struction, the military judge cautioned the members that the appellant was innocent of the offenses and that the Government had the burden to prove his guilt beyond a reasonable doubt. He explained that any vote on the death penalty had to be unanimous if the appellant was convicted of the charged offenses. This laid the groundwork for the individual voir dire of the members by the military judge, trial counsel, and trial defense counsel about their opinion of the death penalty and their ability to be fair and impartial. As such, we find no error.

### 2. Presentencing Instructions on Voting Procedure

▆ The appellant next argues that the military judge improperly instructed the members on sentencing deliberation procedures. The appellant relies on our superior court's decision in *Simoy* to essentially argue that, if there is not unanimous concurrence *the first and only time* the members vote on a proposed sentence of death, it is permanently eliminated as an option.

*Simoy* was reversed because the judge failed to instruct the members to vote on potential sentences from those least severe to those most severe. Our superior court discussed the requirement for unanimous findings of the members at each of the four gates of a capital sentence deliberation. Those gates are: (1) Unanimous findings of guilt of an offense that authorizes the imposition of the death penalty, R.C.M. 1004(a)(2); (2) Unanimous findings beyond a reasonable doubt that an aggravating factor exists, R.C.M. 1004(b)(7); (3) Unanimous concurrence that aggravating factors substantially outweigh mitigating factors, R.C.M. 1004(b)(4)(C); and (4) Unanimous vote by the members on the death penalty, R.C.M. 1006(d)(4)(A). *Simoy*, 50 M.J. at 2. After reciting those gates, the Court noted "[i]f at any step along the way there is not a unanimous finding, *this eliminates the death penalty as an option*." *Id.* (emphasis added).

the burden is on the government to prove his guilt beyond a reasonable doubt. Because one possible punishment in this case is death, it will be necessary to ask you questions regarding your views concerning the death penalty.

This inquiry has no relation at all to whether or not the accused is guilty or not guilty of any offense. As I stated before, the accused is presumed not guilty of all of these offenses.

Contrary to the appellant's argument, we do not interpret this passage in *Simoy* as a substantive limitation on the number of times the members may propose or vote on a proposed death sentence. R.C.M. 1006(d)(3)(A) reads, in pertinent part, "[t]he process of proposing sentences and voting on them may be repeated as necessary until a sentence is adopted." *See also United States v. Thomas*, 46 M.J. 311, 312 (C.A.A.F.1997). The appellant's construction of *Simoy* theorizes that, although the members failed to reach a required concurrence on any potential sentence, they may "repeat the process of discussion, proposal and voting" only with respect to the potential sentences of life, or life without the possibility of parole. The appellant sites no other support for his proposition, and this *Simoy* interpretation conflicts with the plain wording of R.C.M. 1006(c), with which our superior court takes issue in neither *Simoy* nor *Thomas*.

 We interpret the *Simoy* language upon which the appellant relies as pertaining to the unanimity required before members may progress from *one gate to the next* in capital sentence deliberations, not the *process of proposing and voting on sentences*, which "may be repeated as necessary until a sentence is adopted" after members have already appropriately arrived at the fourth gate of such deliberations. Thus, if at the first gate the members do not unanimously find an accused guilty of an offense that authorizes the imposition of the death penalty, then death is no longer an optional sentence. Likewise, if at the second gate the members do not unanimously find beyond a reasonable doubt the existence of at least one common aggravating factor, then death is no longer an option. If at the third gate the members do not unanimously concur that aggravating factors substantially outweigh mitigating factors, then death is no longer an option. Finally, after having appropriately arrived at the fourth gate in sentence deliberations in a capital case, an accused may be sentenced to death only on unanimous vote of all members. That said, after appropriately arriving at the fourth gate of sentence delib-

erations in a capital case and properly considering proposed sentences, members may repeat the process of proposing and voting on sentences, from least to most severe, including a death sentence, until a sentence is adopted by the concurrence required under R.C.M. 1006(d)(4).

With the proper procedure clear, we consider the adequacy of the military judge's instructions to the members. The appellant argues "under the instructions as given, the members would likely believe that provided they did not vote for sentence of confinement for life or confinement for life without eligibility for parole, they could continue to vote on a death penalty repeatedly until they finally reached a unanimous vote." We disagree. In the most pertinent passage, the military judge instructed:

> When you have completed your discussions, any member who desires to do so may propose a sentence. You do that by writing it out on a slip of paper, a complete sentence. The junior member then collects the proposed sentences and submits them to the president, who will arrange them in their order of severity. The court will then vote by secret written ballot on each proposed sentence in its entirety, beginning with the least severe and continuing to the next least severe, until a death—until a sentence is adopted by the required concurrence. You are reminded that the most severe punishment is the death penalty. To adopt a sentence that does not include the death penalty, the required concurrence is three-fourths; that is, nine of the twelve members present. Members, in this connection, you're again advised that the mandatory minimum sentence is confinement for life. The junior member will then collect and count the votes, the count will then be checked by the president, who will immediately announce the result of the ballot to the other members. If you vote on all of the proposed sentences without reaching the required concurrence, repeat the process of discussing, proposal and voting." [11]

11. The military judge appeared to misspeak when saying "... until a death" but corrected himself immediately, saying "... until a sentence is adopted by the required...." The instruction

Consistent with our analysis above, we find no error, as these instructions were in conformity with the applicable Rules for Courts–Martial and case law.

### 3. Presentencing Instruction on Members' Duty

■ The appellant argues that the military judge erred by not instructing the members that they could not consider the "alleged desires of society or any particular segment of society" when determining an appropriate sentence in the appellant's case. The appellant grounds his argument on the various societal references in trial counsel's sentencing argument. In support of this argument, the appellant relies on *United States v. Pearson*, 17 M.J. 149 (C.M.A.1984). We disagree.

At the conclusion of the sentencing case, the military judge instructed the members on the law applicable to the charges before them for sentencing. The military judge instructed, in part, as follows:

> In adjudging a sentence, there are several matters which you should consider in determining an appropriate sentence. Bear in mind that our *society recognizes five principal reasons for the sentence of those who violate the law.* They are: rehabilitation of the wrongdoer, punishment of the wrongdoer, *protection of society from the wrongdoer,* preservation of good order and discipline in the military, and deterrence of the wrongdoer and those who know of his crimes and his sentence from committing the same or similar offenses. The weight to be given to any or all of these reasons, along with all other sentencing matters in this case, rests solely within your discretion.

(Emphasis added.).

Trial counsel then presented the Government's sentencing argument. In his argument, trial counsel referred to society and victim impact. The relevant portions are as follows:

> The community looks at this community, the Air Force, as something different, as we know. And, the Bibb County community has taken us in for this trial, of what is one of the most serious cases you're ever

going to find in the Air Force. People have been here every day and seen different parts of this trial. People have seen the destruction and devastation that an Airman brought upon a family, upon a community, and on the Air Force. He even wore his uniform to commit the offenses. As you think about it, what kind of crime could bring the death penalty in the military? Try to think of one more serious than this, where it wouldn't be authorized.

> . . . .

> ... A community has watched how the Air Force has dealt with it, and the community deserves to hear and see what he did.

Later, trial counsel referred to society and community in the context of the members' debate about the sentence:

> And, when you have that discussion, it only takes one to say no. You all should talk about death and life without parole. You should debate them, and you should all try to come to a unanimous agreement. Even though the law doesn't require it, you all should, because you'll then be unanimous throughout this process. You should talk about it. You should debate it. You should discuss it always in the context of is it appropriate for this case and come to a decision. I'm not going to spend much time talking about life with the possibility of parole. I cannot imagine how you can sentence an accused who kills two people, almost kills a third, walks out of a jail, someday to return to his life, and those two people never will. Those families will never forget this. This community will never forget this. The Air Force will never forget this. *But, that should be your debate.*

(Emphasis added.). At another point, trial counsel argued the far-ranging impact of the case:

> But, what about the communities who are looking to the Air Force for justice in this case? Because this isn't just an Air Force case. This isn't an Airman who stole from the BX, and you only have to deal with it— the impact on that base. This case has

was correctly recited on the written instructions provided to the members.

far-ranging impact. As Houston, Peoria, and everyone else looks to see what the Air Force, what the Air Force views as the right answer when their Airman, and a wife of their Airman, is attacked and killed in base housing by another Airman. You've seen the impact on them, and you've heard about the impact on everybody else.

. . . .

All of the 1500 that showed up to the memorial in Peoria. Imagine that number. Thirty or so from here, military members. You've heard about the impact on wives, sisters, brothers, friends, nephews, military members. The list goes on and on. And, [JK] and his family lost two friends that night. You see the impact on him, and you heard about it.

In rebuttal, the trial counsel once again argued the needs of society and the impact on the community:

[I]n arriving at your determination, select the sentence which best serves the ends of good order and discipline, the needs of the accused, and the welfare of society. Society is watching this case.

. . . .

. . . As eyes turn here to see what justice in the Air Force is, I would suggest that the Air Force, for all the reasons we've talked about—good order and discipline, punishment, his rehabilitation, protection of society from that man who sits behind me.

. . . .

Offer the families a chance to see justice in our community. Offer the families a chance to see Andy and Jamie redeemed. Their lives were taken for no really no

reason. . . . And now you have everybody wondering what is Air Force justice?

At the conclusion of the arguments, the military judge instructed the members on the procedures for their deliberations. He cautioned the members that "[t]he arguments of counsel and their recommendations are only their individual suggestions and may not be considered as a recommendation or opinion from anyone other than counsel." After instructing the members, the military judge asked both trial and trial defense counsel if they had any objections to his instructions or requested additional instructions. Neither side objected and neither side requested additional instructions.

After reviewing the facts, law, and arguments of both sides, we find that this assignment of error does not present a case of plain error. First, the military judge properly instructed the members on all the required sentencing factors, as well as the societal factors for them to consider during their sentencing deliberations. In this regard, he did not abuse his discretion. The Rules for Courts–Martial and case law permit evidence about how crime impacts society. *See* R.C.M. 1001(b)(4); R.C.M. 1005(e)(1)-(5); *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *United States v. Stephens,* 67 M.J. 233 (C.A.A.F.2009).[12]

The appellant grounds the bulk of his argument on *Pearson.* In *Pearson,* a Marine was tried and convicted of negligent homicide of another Marine. After findings, the prosecution stated it intended to offer matters in aggravation. After the military judge overruled the defense objection, the prosecution called two witnesses. The first witness was a Gunnery Sergeant for whom the victim had

---

**12.** R.C.M. 1005(a) states that the military judge "shall give the members appropriate instructions on sentence." R.C.M. 1005(e)(1)-(5) sets forth the required instructions on sentence, which include (1) a statement of the maximum authorized punishment and mandatory minimum punishment, if any; (2) a statement of the effect of any sentence announced will have on the accused's entitlement to pay and allowances; (3) a statement of the procedures for deliberation and voting on the sentence; (4) a statement that the members are solely responsible for selecting an appropriate sentence; and (5) a statement that the members should consider all matters in ex-

tenuation, mitigation, and aggravation. Additionally, the *Benchbook* contains a specific instruction setting forth the reasons for sentencing those who violate the law: (1) rehabilitation of the wrongdoer; (2) punishment of the wrongdoer; (3) protection of society from the wrongdoer; (4) preservation of good order and discipline in the military; and (5) deterrence of the wrongdoer and those who know of his crimes and sentence from committing the same or similar offenses. *Benchbook,* ¶ 8–3–21. *See also United States v. Lania,* 9 M.J. 100 (C.M.A.1980) (holding that general deterrence is a relevant factor to consider in sentencing).

worked. He testified, inter alia, that the decedent was a "great worker, he was loyal, consistent, hard-working, just a definite asset both to the squadron and to the Marine Corps." *Pearson*, 17 M.J. at 150. He also testified that the decedent had intended to stay in the Marine Corps, that 240 enlisted personnel were in the squadron, and that the majority of them were aware of the court-martial. Then, the prosecutor engaged in the following colloquy with the Gunnery Sergeant:

> Q. What has been the impact on the squadron with the death of [the victim]?
> A. The—immediately upon the death of [the victim], it seemed as though the whole squadron had been shaken apart. We couldn't understand how such a tragedy could come to take place within the command, and in the senseless way that it did. *Since his death, and from that date to this, the whole squadron has been waiting to find out the verdict of this court, and to see how his killer was going to be treated.*

*Id.* at 151. The trial defense counsel did not cross-examine the Gunnery Sergeant nor did he object to the testimony. The military judge did not give any cautionary instructions about the Gunnery Sergeant's testimony, nor was he asked to do so.

The prosecution then called the decedent's father to testify. He characterized his son as the example of a "perfect son." The prosecutor then had this exchange with the victim's father:

> Q. [W]hat's the impact of [the victim]'s death been on the community of Reeseville?
> A. The only word I can use, that doesn't even describe it, is devastating. I don't know—*I've been sitting over there trying to think how I can go back home, how I can call my wife tonight, and how I can go back home to Reeseville, and tell them that the verdict was negligent homicide.*

*Id.* During an Article 39(a), UCMJ, session, the military judge admonished the witness that he could not criticize the verdict of the court-martial or suggest that they reached the wrong verdict. Neither side questioned the witness any further, the defense did not request any cautionary instructions, and the military judge did not give any. *Id.* at 151–52.

In its decision, our superior court discussed the importance of victim impact testimony but cautioned that it must be factual, non-inflammatory, and non-argumentative: *"We never want to be guilty of waving the bloody shirt; neither are we to bury the bloody shirt with the victim still in it."* *Id.* at 152 (quoting Falconer, Paul R. and Northrop, Edward S., S. Rep. No. 97–532, 97th Cong., 2nd Sess. 13, *reprinted in* 1982 U.S. Code Cong. & Ad. News 2515, 2517). The Court also noted that "[e]motional displays by aggrieved family members, though understandable, can quickly exceed the limits of propriety and equate to the bloody shirt being waved." *Id.* at 153. The Court found that the military judge did not abuse his discretion by permitting evidence of the victim's character and the loss felt by his family and community. The Court, however, also ruled that the alleged desires of society may not be allowed to interfere with the court's independent function. Thus, the Court found that the "fundamental sanctity" of the court-martial was violated by (1) the testimony of the victim's father that commented on the court's finding, and (2) the testimony of the Gunnery Sergeant that implied the unit was hanging on the outcome of the trial. In the court's view, curative instructions were required despite the lack of a defense objection. *Id.*

We find *Pearson* distinguishable from this case. In *Pearson*, our superior court rested its decision on the value and role of victim impact testimony. Unlike this case, the appellant in *Pearson* challenged evidence presented during sentencing via testimony of the victim's father and the Gunnery Sergeant. He did not challenge the trial counsel's argument, as in this case. Moreover, the testimony of both individuals in *Pearson* questioned the actual findings of the court-martial, whereas trial counsel's argument in this case focused on the relevant sentencing factors for the members to consider during their deliberations. Even so, the appellant asserts that trial counsel's arguments "waved the bloody shirt" such that the military judge was required to give a curative instruction. When

read in its entirety, however, trial counsel's argument was not inflammatory but was within the bounds of providing hard, but fair blows. *United States v. Doctor*, 21 C.M.R. 252, 259 (C.M.A.1956) (holding that although it is permissible for trial counsel to "strike hard blows" during argument, they must be "fair blows"). Trial counsel's sentencing argument referenced society consistent with the military judge's instructions. The trial counsel argued that it was the members' job to determine the appropriate sentence, such as when he argued along the lines of (1) "The weight to be given to any or all of these reasons, along with all other sentencing matters in this case, rests solely within your discretion"; (2) "You should talk about it. You should debate it. You should discuss it always in the context of is it appropriate for this case and come to a decision"; and (3) conceding, "But, that should be your debate."

Moreover, when compared to the sentencing argument in other military death penalty cases, we find the trial counsel's argument was limited in scope and the military judge did not err by failing to give a sua sponte cautionary instruction. *See United States v. Quintanilla*, 63 M.J. 29 (C.A.A.F.2006), aff'g in part and rev'g in part *United States v. Quintanilla*, 60 M.J. 852 (N.M.Ct.Crim.App. 2005); *United States v. Loving*, 34 M.J. 956, 962–63 (A.C.M.R.1992), aff'd, 41 M.J. 213. In *Quintanilla*, the trial counsel gave a highly charged sentencing argument. He engaged in tactics such as sitting on the witness stand, screaming at the appellant, and using words such as "bad hombre," "animal," and "gang-banging." Trial defense counsel objected and the military judge gave a curative instruction. The Navy Court concluded that the trial counsel and assistant trial counsel crossed the line "between zealous prosecution infused with righteous indignation ... and unethical conduct ... [and] jeopardized the integrity of the trial proceedings." *Quintanilla*, 60 M.J. at 867. Even so, the Navy–Marine Corps Court of Criminal Appeals held that the argument did not impact the sentence because of the instruction. *Id.* On review, our superior court affirmed and ruled that the argument did not prejudice the findings because it was made after findings were entered. *Quintanilla*, 63 M.J. at

39. In *Quintanilla*, the cautionary instruction most certainly saved the case in light of the egregious nature of the argument. Trial counsel's argument pales in comparison to that in *Quintanilla*.

In *Loving*, trial counsel argued societal factors during his sentencing argument. That appellant challenged the following passage:

> What the defense has glossed over in their entire argument is justice. What sentence serves justice? Crimes, when they're committed, demand punishments that fit them. The message that you send out, and you will send out a message with your sentence today, that message is not going to go just over this installation, but it is going to go across the United States. There's going to be a message that's going to be heard by working people. They need to know that they will not be terrorized in their work places. Americans, members of society, need to know that they will be protected and that they will be protected and that we will protect and we will vindicate society's victims.

*Loving*, 34 M.J. at 965. The defense objected to the argument, but the judge overruled the objection and proceeded to give the required instructions on sentencing. *Id.* On appeal, the appellant asserted that trial counsel erred in arguing general deterrence. The Army court found no error, holding that the military judge properly instructed the members to take into account the circumstances of the case and the character and propensities of the accused. *Id.* (citing *United States v. Lania*, 9 M.J. 100 (C.M.A.1980)) (holding that general deterrence is a relevant factor when determining a just sentence so long as the military judge instructs the members on other factors, such as rehabilitation, the circumstances of the case, and the character and propensity of the accused).

Here, trial counsel's argument was more limited in scope than that in *Loving* and *Quintanilla*. Although the defense did not object, the military judge did not err by failing to give a sua sponte curative instruction. In fact, the military judge properly instructed the members absent a curative

instruction, and trial counsel's argument stayed within the bounds of those instructions.

## V.

### Post–Trial Issues

#### A. Post–Trial Challenge of Military Judge

The appellant asserts that the military judge erred in denying a post-trial motion challenging the military judge for cause. One basis for the post-trial challenge was that the military judge did not satisfy the regulatory requirements to sit as an Air Force military judge. The crux of the appellant's argument is that, because the military judge has failed to maintain his authority to practice law in Florida, he is not qualified to be designated as a Judge Advocate under AFI 51–103, *Designation and Certification of Judge Advocates* (7 December 2004).[13]

Consistent with our ruling in *United States v. Maher*, 54 M.J. 776 (A.F.Ct.Crim.App. 2001), *aff'd*, 55 M.J. 361 (C.A.A.F.2001), and our previous Order denying Appellant's Motion to Compel Documents relating to the judge's licensing status, *United States v. Witt*, ACM 36785, 2007 WL 4255299 (A.F.Ct. Crim.App. 19 October 2007), we find the appellant's claim to be meritless.

#### B. Assistant Trial Counsel's Authentication of the Record

█ The appellant asserts that remand of the case is necessary to correct what is alleged to be an error in the record of trial appearing in the certificate of compliance authenticating the record of the post-trial Article 39(a), UCMJ, hearing. Specifically, the appellant alleges Capt RH improperly signed the certificate as "trial counsel," when in reality his role was as an assistant trial counsel during a post-trial Article 39(a), UCMJ, session. Additionally, the appellant alleges that Capt RH improperly backdated his signature to reflect a date of "7 Jul 09,"

when he believes Capt RH's review of the record was not complete at that time.

The appellant previously raised this exact issue in a post-trial motion to remand the record of trial for correction of the certificate of compliance with R.C.M. 1103(i)(1)(A). With respect to this issue, the appellant asserts the panel ignored certain facts. We disagree. Having reviewed the record of trial again and in accordance with our previous ruling on this issue, we find Capt RH was an assistant trial counsel at the post-trial Article 39(a), UCMJ, session and thus was a proper party to sign the certificate of review. R.C.M. 502(d)(5); R.C.M. 1103(i)(1)(A); AFI 51–203, ¶ 12.1; *United States v. Credit*, 4 M.J. 118, 119 n. 5 (C.M.A.1977). We further find the record indicates Capt RH's review was completed on 7 July 2009. The e-mail traffic presented between Capt RH and trial defense counsel fails to establish the contrary. As such, we find no error.

#### C. Post–Trial Delay

The appellant alleges three errors relating to the post-trial processing of his case, and seeks relief in the form of affirming a sentence of life without the possibility for parole, total forfeitures, reduction to the grade of E– 1, and a dishonorable discharge. We find no error.

█ First, the appellant asserts that a lengthy period of confinement on death row followed by execution constitutes cruel and unusual punishment in violation of the Eighth Amendment[14] and Article 55, UCMJ, 10 U.S.C. § 855. Essentially he argues that the mental anxiety felt during the delay, the anticipation of execution, and his inability to avoid appellate review of his sentence[15] have served to increase his sentence to a degree that is unconstitutional. We disagree.

█ Whether a punishment constitutes cruel and unusual punishment under the Eighth Amendment or cruel or unusual punishment under Article 55, UCMJ, is a question of law this Court considers de novo.

---

13. In consideration of this issue, this court has taken judicial notice of Air Force Instruction 51– 103, *Designation and Certification of Judge Advocates* (7 December 2004), and the Rules Regulating the Florida Bar.

14. U.S. Const. amend. VIII.

15. Article 61, UCMJ, 10 U.S.C. § 861.

*United States v. White,* 54 M.J. 469, 471 (C.M.A.2001). While this Court recognizes there has been a lengthy delay between the convening authority's approval of his sentence and our ruling on the appellate issues, we find this delay harmless beyond a reasonable doubt. As appellant points out in his brief, no American court has ruled that a lengthy period of confinement followed by execution is impermissible, and we decline to adopt such a standard based upon the delay in this case. Furthermore, given our decision to set aside the death sentence and remand the case for a new sentencing hearing, we can find no prejudice to the appellant's rights.

■■■■ Second, the appellant asserts that his Fifth Amendment [16] right to be free from unreasonable post-trial delay has been violated. The Fifth Amendment requires that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." We note that the overall delay between the time the case was docketed at the Air Force Court of Criminal Appeals and completion of review by this Court is facially unreasonable. Because the delay is facially unreasonable, we examine the four factors set forth in *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *United States v. Moreno,* 63 M.J. 129, 135–36 (C.A.A.F.2006). When we assume error but are able to directly conclude that any error was harmless beyond a reasonable doubt, we do not need to engage in a separate analysis of each factor. *See United States v. Allison,* 63 M.J. 365, 370 (C.A.A.F.2006). This approach is appropriate in the appellant's case. The post-trial record contains no evidence that the delay has had any negative impact on the appellant and in fact has resulted in a finding of ineffective assistance of counsel warranting remand for a new sentence hearing. Having considered the totality of the circumstances and the entire record, we conclude that any denial of the appellant's right to speedy post-trial review and appeal was harmless beyond a reasonable doubt.

Finally, the appellant argues the excessive post-trial delay in this case warrants relief under *United States v. Tardif,* 57 M.J. 219 (C.A.A.F.2002). While we acknowledge this authority to grant relief absent prejudice to the defense, we find that, in light of our decision to set aside the sentence, any additional relief would be an unwarranted windfall under the facts of this case. We decline to grant such relief.

## VI.

### Additional Assignments of Error

We have considered the appellant's 57 summary assignments of error. Each makes broad-based attacks on: (1) the role of the convening authority, (2) the court-martial system and procedures, or (3) miscellaneous alleged constitutional violations without further briefing on any of these issues. The majority of the issues presented were previously rejected in *Weiss v. United States,* 510 U.S. 163, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994), *Solorio v. United States,* 483 U.S. 435, 107 S.Ct. 2924, 97 L.Ed.2d 364 (1987), *Gray,* 51 M.J. 1, *United States v. Curtis,* 44 M.J. 106 (C.A.A.F.1996), and *Loving,* 41 M.J. 213. After consideration of each of the issues, we find them to be without merit. *See United States v. Matias,* 25 M.J. 356, 361 (C.M.A. 1987) (holding there is no requirement to specifically address each assigned error so long as each error is considered).

## VII.

### Conclusion

The findings are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred in the findings portion of this case. Article 66(c), UCMJ, 10 U.S.C. § 866(c). Accordingly, the findings are affirmed. The sentence is set aside and the record of trial is returned to The Judge Advocate General for remand to the convening authority. A rehearing on sentence is authorized.

16. U.S. Const. amend. V.

STONE, Chief Judge, and HARNEY, Senior Judge, concur.

GREGORY, Senior Judge; ROAN, Senior Judge; HELGET, Senior Judge; HECKER, Judge; SOYBEL, Judge; CHERRY, Judge; MITCHELL, Judge; WEBER, Judge; WIEDIE, Judge; and PELOQUIN, Judge, did not participate.[17]

ORR, Senior Judge, with whom MARKSTEINER, Judge, joins, concurs in part and dissents in part:

I concur with the majority's decision on findings and I agree with the majority that, even with the "strong presumption of competence" trial defense counsel's performance in the preparation for the sentencing portion of the trial was deficient. Particularly, their reliance upon Dr. BM's advice when deciding not to investigate the potential mitigation evidence resulting from the appellant's motorcycle accident falls below professional norms. However, the appellant has failed to make a showing of prejudice.

The majority correctly observes that additional neuropsychological testing could have revealed whether the appellant suffered some injury to his brain resulting from a motorcycle accident four months prior to committing his crimes. Further, it appears undisputed that certain types of brain damage or disease from which the appellant may have suffered are often implicated in disinhibited emotional and aggressive behavior. However, as the majority notes, the test for prejudice on a claim of ineffective assistance of counsel is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter,* — U.S. —, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). The panel members found the appellant guilty of murdering SrA AS and his wife, JS, and attempting to murder (then) SrA JK. Given the appellant's planning and protracted execution of, in combination with the clear thinking and rationale he articulated and recalled for carrying out, these senseless and brutal offenses, I am not convinced the sentence would have been different had trial defense counsel better handled the errors the majority finds prejudicial. In short, under the aforementioned facts of this case, I would find no prejudice.

---

17. Senior Judge Gregory, Senior Judge Roan, Judge Hecker, and Judge Weber, did not participate due to conflicting interests. Judge Cherry did not participate due to his retirement. The remaining judges each chose not to participate given their recent assignments to the Court.